W. E. WHITE, ADMINISTRATOR OF W. E. WHITE, JR., v. HEMBY CHAPPELL AND NORFOLK SOUTHERN BUS CORPORATION.

(Filed 31 May, 1941.)

**1. Death § 3—**

In an action for wrongful death the burden is on plaintiff to prove negligence on the part of the defendant, and that such negligence, acting in continuous and unbroken sequence, and without which injury would not have occurred, resulted in the injury producing death, and that under the circumstances a man of ordinary prudence could have foreseen that such result was probable.

**2. Carriers § 21a—**

While a carrier is held to the highest degree of care for the safety of its passengers consistent with the practical operation and conduct of its business, a carrier is not an insurer of their safety, but its liability is based on negligence.

**3. Carriers § 15—**

Ordinarily, the relationship of carrier and passenger terminates when the carrier discharges the passenger in a place of safety at the destination contracted for, or designated by the passenger.

**4. Same—Interurban bus terminates relationship of carrier and passenger when it discharges passenger in place of safety on highway near place designated.**

The evidence tended to show that an interurban bus carrier had regular scheduled stops at cities between its termini, that a mother and son purchased tickets for transportation from one of such cities to another, and, at the mother's request to stop at a particular house before reaching the destination called for in their tickets, the driver stopped on the right side of the highway in front of the house and permitted them to alight on the shoulders of the road. *Held:* The relationship of carrier and passenger terminated when the passengers alighted in a place of safety on the shoulders of the road notwithstanding that the house designated was on the opposite side of the highway therefrom, the carrier being under no duty to transport them to the house designated.

**5. Carriers § 22c—**

Ordinarily, there is no duty resting upon a carrier to assist passengers in boarding or alighting from its train, or car, or bus.

**6. Same—Where mother and son are traveling together as passengers· on bus, primary duty of caring for son is on the mother.**

Where a mother and her eight-year-old son are traveling as passengers on a bus, the primary duty of caring for the child is on his mother, and when the bus stops on the right of the highway at a place designated by the mother, and the child first alights on the shoulders of the road, followed by his mother, the carrier, through its employees, has the right to assume that the mother will take proper care of him and that the child in leaving his seat and alighting from the bus is acting with her·knowledge and consent in the absence of any indication to the contrary, and even though the carrier's porter helps the child to alight, the carrier is not under duty to anticipate that he would run away from her and attempt to cross the highway ahead of her in the dark, or to warn them of cars approaching from the opposite direction, the mother having said nothing to put its employees on notice that the child required restraint and the mother having full knowledge that they were stopping on a much traveled highway and being cognizant of the dangers incident thereto.

**7. Same—Evidence held insufficient as matter of law to show negligence on part of carrier causing death to passenger struck on highway by car after alighting from bus on shoulders of road.**

The evidence tended to show that a mother and her eight-year-old son were passengers on defendant's bus, that in compliance with the mother's request to stop at a designated house on the highway before reaching the destination called for in their tickets, the driver stopped the bus on the right side of the highway in front of the house. which was on the opposite side of the highway, that the child first alighted followed by his mother, that when she alighted she called him but did not see him, and that after the porter had reëntered the bus but while the bus was still motionless, the child ran around the rear of the bus and across the highway and was hit by a car traveling in the opposite direction. Plaintiff's evidence tended to show that the porter assisted the child to alight, and that the bus driver saw the lights of cars approaching from the opposite direction and failed to give warning thereof. *Held:* The evidence is insufficient, as a matter of law, to establish negligence on the part of the carrier causing the fatal injury, and its motion for judgment as of nonsuit should have been allowed.

**8. Same—**

The fact that a bus stops on the right side of the highway at night without warning and stands without dimming its lights while passengers alight therefrom onto the shoulders of the highway, can have no causal connection with the death of one of such passengers, a boy eight years of age, resulting from injuries inflicted by a car traveling in the opposite direction which struck him as he attempted to run across the highway in its path from the rear of the bus.

DEVIN, J., dissenting.

CLARKSON and SEAWELL, JJ., concur in dissent.

APPEAL by defendant Norfolk Southern Bus Corporation from *Harris, J.,* at September Term, 1940, of CHOWAN.

Civil action for recovery of damages resulting allegedly from wrongful death of W. E. White, Jr.   C. S., 160-161.

The record tends to show this factual situation:

Plaintiff's intestate, W. E. White, Jr., a bright and intelligent boy, nine days less than eight years of age, was fatally injured about 7:30 o'clock on the night of 8 April, 1939, when stricken by an automobile owned and operated by defendant Hemby Chappell, traveling south along the paved portion of the western half of the highway between Hertford and Winfall in this State. The boy had just alighted from a motor bus of defendant Norfolk Southern Bus Corporation, a common carrier of passengers, operated over its duly franchised route between Raleigh, North Carolina, and Norfolk, Virginia, an "interurban" bus having scheduled intermediate stops at Edenton, Hertford, and other cities and towns, traveling north on said highway, and on which he, accompanied by and in the care of his mother, Mrs. W. E. White, was a passenger. She, desiring to take her son on a visit to his paternal grandmother, who resided in the country between the towns of Hertford and Winfall, purchased tickets at the station of Bus Corporation at Edenton, North Carolina, for bus transportation for herself and son, from Edenton to Winfall. They entered the 7 o'clock bus, of 33-passenger capacity, and sat on the right-hand side somewhere between the middle and the front, as she states, that is, three or four seats from the front, as shown by evidence for defendant—she sitting by the window and he beside her next to the aisle. As they entered the porter took her large suitcase, but she retained a shoe box which she placed on the floor at her feet. At Hertford, the first stop after leaving Edenton, she told the driver of the bus that she wanted to stop at the second house on the other side, north side, of Major Loomis' office, "this side of Winfall." Testifying relative thereto, she said: "I did not tell him which side of the highway to stop on, all I told him was to stop at the second house beyond Major Loomis' office." The bus stopped at the point designated by her, which was in front of the home of intestate's grandmother located on the west side of highway. It came to rest with all four wheels on its right-hand side, that is, east side of center line of the paved portion of the highway, according to evidence for plaintiff, and with its right wheels two feet from east edge thereof, on the right shoulder, as evidence for defendant tends to show. Mrs. White and the boy left the bus by usual way through the door on the right at front of bus opposite the driver's seat, and alighted upon the right or east shoulder of the highway. After alighting the intestate went to the rear of the bus, which was thirty-five feet long, and, while there started to run across the highway from the east to west side and was stricken by automobile of defendant Chappell, as above stated.

When the bus stopped, Mrs. White, according to her testimony, leaned over to get the shoe box from the floor at her feet. When she raised up the boy had left his seat beside her. She saw him going behind the

porter who had her suitcase.  The door was open.  The porter was going down the steps, and the boy was ready to go down.  She did not call the boy "nor ask him to wait, or anything of the kind."  She proceeded to the front and as she went down the steps the porter was at the door ready to get on.  As soon as she alighted he "hopped back in and pulled the door to."  The bus started to shift gears.  She testified: "When I got out of the bus the first thing I did was to look for my boy.  I did not see him.  Then I called but he did not answer.  The next thing I heard was just a slam" that seemed to come from the rear of the bus, which was not then in motion,—that she stood there five minutes or more before the bus moved.

In describing the situation and their actions after the bus stopped, Mrs. White testified: "All I had to do was to lean over and take hold of the package.  I waited until the bus stopped, and then leaned over to get my package.  I didn't see the boy when he got up.  I know he was there when the bus stopped.  Then I leaned over to get my package in preparation to get off the bus.  Then I looked and saw my little son standing in the front of the bus ready to get off  .  .  .  behind the porter  .  .  .  Nobody else was at that point  .  .  .  There were no passengers in front of me  .  .  .  There was nobody in the aisle .  .  .  It didn't take me long to get that package off the floor  .  .  . Immediately after I got my package I got up to get off  .  .  .  When I looked up my son had left.  I saw where he was.  I did not ask him to wait or anything of the kind.  I had not gotten to the door before my son left the bus, because he had stepped out before I could get off  .  .  . When I got there I immediately got off  .  .  .  as soon as I could.  I knew my son had gotten off, and I thought I had better get off the bus to take care of him.  When I got off  .  .  .  however, I did not see him.  .  .  .  The porter  .  .  .  got off before my son did  .  .  .  I did not see any automobile coming from the opposite direction  .  .  . I didn't notice  .  .  .  Sure, there was one coming  .  .  ."

She further testified: "I did not see any cars coming down the highway from the direction of Winfall while I was on the bus, or at any time before I heard this crash.  Neither the driver of the bus nor the porter notified or warned me that any cars were coming down the highway. Nor did they notify or warn my little boy, in my presence  .  .  .  I don't know how long I stood there outside the door before the bus moved off  .  .  .  about five minutes or more.  It was shifting gears when I got off."  Again, she testified: "He (speaking of her son) had visited this point on the highway before, but not at night.  I had been there at that point on the highway.  I knew that automobiles traveled up and down there, certainly.  It is a very busy highway."

At the time and at the point of the accident the paved portion of the highway was sixteen feet wide, with dirt shoulders approximately ten feet in width,—in good condition to the bank of the ditch which sloped at an angle of forty-five degrees for a further distance of six feet. The point was about midway of a straight section of the highway three-fourths of a mile in length, north of the causeway just out of Hertford. When the bus leaving Hertford entered this section the driver saw in the distance the lights of two automobiles, that of defendant and that occupied by one John Moore and others, traveling south, and the occupants of those cars saw the lights of the bus. The driver of the bus gave no signal before stopping.

Plaintiff's evidence further tends to show these facts: Along this straight section Chappell passed the Moore car which was traveling at rate of speed of forty to forty-five miles per hour, and after passing "increased its distance ahead . . . just a little." These two cars were approaching the point and meeting the bus when it stopped. At the time the front of "Chappell's car was just passing the front end· of the bus," "the little boy ran out from behind the bus," and was stricken by the right front of the car just before clearing the pavement, the west side, and "was picked up" a hundred feet from where he was stricken. Chappell's car stopped at a point fifty feet further up the highway. At the moment of the impact the bus had not moved forward.

Evidence for plaintiff further tended to show that the bus was six feet seven inches wide and had bright lights, which were not dimmed when it stopped; that the front of the bus was so lighted as to show its destination "Norfolk"; and that the occupants of the Moore car, following defendant Chappell, could and did see that it was a bus and that it had stopped and was on the highway.

Testimony of defendant Chappell tended to show that he was driving a Mercury sedan automobile in which five others were riding; that the lights and brakes of the automobile were in good condition; that he first saw the lights of the bus approximately one-half mile from the place where the bus stopped; that they were "kind of blinding," but, he testified: "As I got up nearer I saw it was the bus," "may be 100 yards away"; that he had been driving at speed of fifty miles per hour, but when he saw it was a bus he slackened up as he always does at night to around forty miles an hour; that to the best of his judgment when he was approaching the bus he was going around forty miles an hour. He testified: "As I got off against it the bus started up, and as it did I saw this boy flash out from behind it, and from the time I saw him to the time I applied my brakes I had already hit him . . . At the time I saw the boy running out I could still see the bus to the left. The bus started off and the boy ran out, directly behind the bus. When I saw

him he was right in front of me, right on me, I would say. . . . I could not have avoided striking the boy by turning to the left, not at that time; I would have to have turned into the bus, and the boy was running to the right all the time, and he would be probably caught under the car if I had tried to turn to the right. . . . I was about 8 feet from the child when I first saw him, I think. . . . In my best judgment I was going 40 miles an hour." . . . And, again: "He came out not over 15 feet ahead of my car. My judgment is that it was between 8 and 15 feet . . . When that boy ran out I had 15 feet before reaching him to turn to the left if the bus had not been there." Then on further cross-examination Chappell stated that the bright lights would blind a little, that they caused him to slow down and to look out more, that they did not interfere with his seeing the boy after he, Chappell, passed the bus; that the boy did not come out from behind the bus until he, Chappell, had passed the front of the bus, and, finally, in answer to question, "The glaring lights, however bright they were, did not interfere with your seeing that little boy?" he said, "No, sir."

There was evidence for defendant Bus Corporation tending to show that Mrs. White did not tell the driver or the porter where she was going; that they didn't know where she was going; that when the bus stopped the porter set off Mrs. White's suitcase; that she came out next; that the porter helped her, and she stood by the bag, and that he "reached back on the bus and took the little boy and set him down, and got back into the bus"; that neither the driver nor porter said "anything to Mrs. White when she got off, nor to the little boy"; and that the bus pulled out and they knew nothing of the accident until next day.

While alleging concurrent negligence of the defendants, plaintiff alleges these acts of negligence against the Bus Corporation: (1) That it failed to denote its intention to stop the bus upon the highway; (2) that while approaching and after stopping, it failed to dim the headlights of the bus; (3) that it parked or left the bus standing upon the paved portion of the highway,—with a clear and unobstructed width of only about eight feet of same opposite the bus free for passage for other vehicles; (4) that it failed to warn plaintiff's intestate, or his mother, of the danger of attempting to cross the highway, or of the approach of other motor vehicles from the north; (5) that it failed to assist intestate in his attempt to cross the highway and in permitting him to do so, when his mother was still in the bus, or descending therefrom, and so unable either to warn or restrain him; and (6) that it failed to provide plaintiff's intestate with a reasonably safe place in which to alight from said bus in that, knowing that the home of his grandmother was west of the highway, it stopped the bus on the eastern side of the paved portion and discharged the intestate on the east shoulder, well knowing at the time

that he would be compelled to cross the highway to reach his destination, and would probably attempt to do so, under the existing conditions, unless warned or restrained, whereas by waiting until the approaching automobiles had passed before discharging intestate from the bus, or by stopping on the western shoulder of the highway, it could in the exercise of due care have discharged him in such manner as to permit him to reach his destination without danger, and particularly without exposing him to the peril arising from the then existing traffic upon the highway.

Defendant, Bus Corporation, in its answer denied the material allegations of the complaint, and pleaded contributory negligence of the mother of intestate in bar of plaintiff's right to recover.

As the jury failed to find that the injury and death of plaintiff's intestate was caused by negligence of defendant Chappell, and plaintiff does not appeal, the allegations against him and his answer thereto will not be stated.

The jury answered the issue as to negligence of defendant Bus Corporation in the affirmative, and as to contributory negligence of the mother in the negative, and assessed damages.

From judgment on verdict defendant Bus Corporation appeals to Supreme Court, and assigns error.

*McMullan & McMullan for plaintiff, appellee.*
*R. C. Dozier, Fred C. Martin, J. C. B. Ehringhaus, and Chas. Aycock Poe for defendants, appellants.*

WINBORNE, J. While appellant presents other exceptive assignments which are worthy of serious reflections, those pertaining to the refusal of the trial court to grant its motions, aptly made, for judgment as in case of nonsuit, and to give peremptory instruction for negative answer to issue of negligence are decisive of this appeal. When taken in the light most favorable to plaintiff, the evidence as to actionable negligence of defendant, Norfolk Southern Bus Corporation, the appellant, is in our opinion insufficient to take the case to the jury and to support the verdict against it, and we so hold.

In an action for recovery of damages for wrongful death, resulting from alleged actionable negligence, the plaintiff must show: First, that there has been a failure on the part of defendant to exercise proper care in the performance of some legal duty which the defendant owed plaintiff's intestate under the circumstances in which they were placed; and, second, that such negligent breach of duty was the proximate cause of the injury which produced the death,—a cause that produced the result in continuous sequence, and without which it would not have occurred, and one from which any man of ordinary prudence could have foreseen

that such result was probable under all the facts as they existed. *Whitt v. Rand,* 187 N. C., 805, 123 S. E., 84; *Murray v. R. R.,* 218 N. C., 392, 11 S. E. (2d), 326; *Mills v. Moore, ante* 25, 12 S. E. (2d), 661, and cases cited.

Generally where the relation of carrier and passenger exists the carrier owes to the passengers the highest degree of care for their safety so far as is consistent with the practical operation and conduct of its business. But, the liability of the carrier for injuries to a passenger is based on negligence. The carrier is not an insurer of the safety of passengers. *Hollingsworth v. Skelding,* 142 N. C., 246, 55 S. E., 212; *Marable v. R. R.,* 142 N. C., 557, 55 S. E., 355; *Briggs v. Traction Co.,* 147 N. C., 389, 61 S. E., 373; *Mills v. R. R.,* 172 N. C., 266, 90 S. E., 221. See, also, Annotations 4 A. L. R., 1500; 31 A. L. R., 1202; 45 A. L. R., 297; 69 A. L. R., 980; 96 A. L. R., 727.

Ordinarily, when the relationship of carrier and passenger is created it continues until the journey, expressly or impliedly, contracted for has been concluded, unless the passenger sooner terminates or relinquishes his right as such. 13 C. J. S., 1075, Carriers, 566; *Wallace v. R. R.,* 174 N. C., 171, 93 S. E., 731. In either event, whether the journey so contracted for has been concluded, or sooner terminated or his right thereto relinquished by the passenger, such relationship ordinarily ends when the passenger has alighted from the bus in a place of safety on the street or highway. 13 C. J. S., 1074, Carriers, section 565; *Waldron v. Southwestern Bus Co.,* 42 Ohio App., 549, 182 N. E., 596; *Roden v. Connecticut Co.,* 113 Conn., 408, 155 A., 721; *Lewis v. Pacific Greyhound Bus Co.,* 147 Ore., 588, 34 P. (2d), 616, 96 A. L. R., 718; Annotations 31 A. L. R., 572, and 96 A. L. R., 727, where cases are assembled. See, also, *Cooke v. Elk Coach Line* (Del.), 180 A., 782.

In the present case when the plaintiff's intestate and his mother, in whose care he was traveling, entered the bus of defendant Norfolk Southern Bus Corporation at Edenton with tickets for their transportation thereon to Winfall, the relation between the Bus Corporation and them became that of carrier and passengers. Hence, the legal duty which defendant Bus Corporation, as a common carrier of passengers, owed to them arose out of the relationship of carrier and passenger, and ended when the passenger alighted in a place of safety. See Annotations 96 A. L. R., 727.

In this State there are no cases dealing with the subject of the duty owed by the owner of a bus, a common carrier of passengers, to alighting passengers. But, there are two cases which treat the question of the duty of a street car company to alighting passengers: *Wood v. Public-Service Corp.,* 174 N. C., 697, 94 S. E., 459; *Loggins v. Utilities Co.,* 181 N. C., 221, 106 S. E., 822.

While in these cases the factual situations are different from that in the present case and they are, therefore, distinguishable from the present case, the Court there recognized that the weight of authority is that the relation of carrier and passenger ceases when the passenger has safely alighted. In the *Loggins case, supra,* where plaintiff was struck after alighting in the lane of traffic, it is said: "By the clear weight of authority the relation of passenger and carrier ordinarily ends when the passenger safely steps from a street car to the street. He then becomes a pedestrian on the public highway, and the carrier is not responsible for his safe passage from the street to the sidewalk; for once safely landed in the street, his rights as a passenger cease," citing *Wood v. Public-Service Corp., supra,* and other cases. But, continuing, the Court said: "Obviously there is a difference between a safe landing and a landing in safety. The one has reference to the act of the passenger in stepping from the car to the street, the other to the condition in which he finds himself immediately after accomplishing this act.

"We think a fair statement of the rule would be to say that a passenger, on alighting from a street car at the end of his journey, loses his status as a passenger when he has stepped from the car to a place of safety on the street or on the highway. The question should not be made to depend entirely upon the number of steps which the passenger may take on leaving the car, but rather the circumstances and conditions under which he alights. He is entitled to be discharged in a proper manner and at a time and place reasonably safe for that purpose." The ruling there that the duty of carrier to an alighting passenger extends not only to "a safe landing" but to "a landing in safety" is the limit to which any of the courts have carried the principle, even where the passenger alights on the traveled portion of the street or highway.

If the case in hand be tested by that standard all the evidence clearly shows that defendant Bus Corporation fully performed its duty to plaintiff's intestate in both respects. He was not injured in alighting or at the place of landing, but at a point some distance away to which he had moved after landing in safety. The courts in other jurisdictions have applied the principle to cases involving the duty of common carriers of passengers by means of buses.

In *Waldron v. Bus Co., supra,* plaintiff, a passenger having alighted from an eastbound bus in safety on the southerly side of the pavement, although on the corner of an intersecting street opposite the regular stopping place, walked west to the rear of the bus, while the bus began to move on, and started north across the highway when she was struck by a westbound car. The Ohio Court of Appeals, in opinion by *Richards, J.,* held that the defendant owed to her, while she was a passenger, a high degree of care for her safety, but that the relationship of carrier

and passenger terminated when she alighted from the bus in a place of safety, and that the proximate cause of her subsequent injury was either her own negligence in walking in front of an approaching automobile or the negligence of the operator of the automobile, and "the defendant was in no sense responsible for the injury resulting therefrom,—having discharged the passenger in a place of safety, there could be no causal connection between that act and the injury which she suffered."

In the *Roden case, supra,* the plaintiff, a boy seven years old, rode as a passenger in the bus of defendant from New Britain to the end of its run on Farmington Avenue. The driver drove the bus toward the left. The only door was on the right side of the bus, the side toward the macadam. The driver opened the door and the boy descended the steps to go to his home on the opposite side of the street. He was struck by an automobile proceeding in the same direction as the bus. The Supreme Court of Errors of Connecticut, speaking through *Maltbie, C. J.,* said: "The duty of a common carrier of passengers includes an obligation to furnish them a safe place in which to alight, as far as that place is provided by it or is affected or conditioned by the movement of the vehicle, and that duty is only satisfied if it exercises the highest degree of care and skill which reasonably may be expected of intelligent and prudent persons engaged in such a business, in view of the instrumentalities employed and the dangers naturally to be apprehended. . . . An automobile bus is able to move or stop in the street at the will of its driver, and the safety of the place he offers its passengers to alight may be affected or conditioned by the passing traffic. . . . The care to be exercised toward a young child traveling by himself must be proportioned to the degree of danger inherent in his youth and inexperience. . . . When, however, the duty of the carrier to provide a safe place to alight has been fulfilled and the passenger has left the vehicle, it ceases to owe to him any duty other than that which it owes to any person coming within the range of its activities, not to do him injury by a failure to exercise reasonable care." The last two sentences read together are significant. And, continuing, the Court said: "In the instant case the driver had abundant opportunity to let the plaintiff out at the side of the road, off the highway, in a place of safety. Yet, instead of doing so, he chose to invite him to alight upon the macadam of the street at a time when the jury might have found that the automobiles were approaching in such a way as to endanger him as he stepped upon the pavement and when, had the driver looked with any care to the rear, he must have seen them."

And, in *Lewis v. Pacific Greyhound Lines, supra,* a case strikingly similar to case at bar, the plaintiff, a man, was discharged as a passenger on the right side of the bus. He went out the front door on the gravel

shoulder of the pavement. After having alighted in safety, he walked thirty-five feet to the rear and halfway across the pavement, which was sixteen feet wide, when he was struck by a passing automobile. The opinion of the Supreme Court of Oregon, by *Belt, J.,* is epitomized in the third headnote, which reads: "A bus company is as a matter of law not guilty of any breach of duty to a passenger in setting him down at night, without warning of danger, at a place on the side of the road where he was out of danger from vehicular traffic, though such place was on the opposite side of the road from a restaurant where it maintained an agency for the sale of tickets, and which bore a sign marking it as a bus depot, in walking toward which, across the highway, the passenger was struck by an automobile, though he supposed, in view of the fact that he boarded a bus on the fill in front of the restaurant on the previous day, that he was being set down there." And, continuing, the Court uses this language: "Assuming, but not conceding, that the defendant bus company was negligent in failing to discharge the plaintiff as a passenger on the west side of the highway in front of the restaurant or barbecue stand, it is believed that such negligence has no causal connection with the injury sustained. . . . The proximate cause of the injuries of which plaintiff complains was either the negligence of the driver of the car which struck him, or his own negligence in failing to exercise due care to avoid being injured while undertaking to cross the highway."

In applying these principles, a fair appraisal of the case in hand requires that these facts be borne in mind: (1) The defendant Bus Corporation is engaged in the business of a common carrier of passengers by means of interurban buses operated over a duly franchised route upon the highway from Raleigh, North Carolina, to Norfolk, Virginia, having scheduled intermediate stops at Edenton, Hertford, and other cities and towns along the way. (2) The mother of intestate, in whose care he was traveling, purchased, and they were traveling on tickets for their transportation, upon a bus of defendant Bus Corporation from Edenton to Winfall in North Carolina. (3) At the request of mother of intestate the bus stopped on the highway before reaching Winfall for intestate and his mother to alight at a point designated by her. (4) The intestate and his mother alighted upon the right shoulder of the road out of the line of and danger from traffic upon the highway in the light of all the evidence in the case.

When so appraised there is lacking any evidence of contractual relationship between defendant Bus Corporation and plaintiff's intestate by which duty is imposed upon the former, as carrier, to do more than provide for the intestate, its passenger, a safe landing and a landing in safety.

In brief, for plaintiff it is virtually conceded that if plaintiff's intestate had remained in the place in which he alighted, he would have been perfectly safe from the danger of traffic upon the highway. But it is insisted that the destination of his intestate was "across the highway at his grandmother's home." While it appears from the evidence that such was the ultimate destination of intestate and his mother, yet as regards the obligation of defendant Bus Corporation there is no evidence that it either expressly or impliedly agreed, or from which it may be inferred that it agreed to transport them to the home of the grandmother. On the contrary, all the evidence tends to show that the Bus Corporation was carrying on the business of common carrier over the highway between certain designated points with certain scheduled stops along the way. Hence, "to stop at the second house on the other side . . . of Major Loomis' office, this side of Winfall" means no more than to stop on the highway at that point. It was not a regular stop, but was made patently as an accommodation to plaintiff's intestate and his mother, at a point selected by her and with which she and he, a bright and intelligent boy, were familiar.

However, the plaintiff insists that the duty owed by defendant Bus Corporation to his intestate continued until he was safely across the highway, and for support he relies upon these cases in other jurisdictions: *Draper v. Robinson* (Texas), 106 S. W. (2d), 825, modified upon other points in 127 S. W. (2d), 191; *Taylor v. Patterson's Adm'r.*, 272 Ky., 415, 114 S. W. (2d), 488; *Mackenheimer v. Falknor*, 144 Wash., 27, 255 P., 1031; *Gazaway v. Nicholson* (Ga.), 5 S. E. (2d), 391; *Stuckwich v. Hagon Corp.* (Pa.), 175 A., 381; *Shannon v. Central Gaither Union School Dist.*, 133 Cal. App., 124, 23 P. (2d), 769; *Phillips v. Hardgrove* (Wash.), 296 P., 559.

An examination reveals that each of these cases relates to the duty owed by the operator of a school bus in transporting children from their homes to school and from school to their homes—and are clearly distinguishable from the case in hand. For example, the case of *Taylor v. Patterson's Adm'r., supra*, sets forth the distinguishing features. In this case Taylor was owner and operator of a jitney bus and a public carrier of passengers. The transportation of his passenger, Billy Patterson, a Negro boy less than seven years of age, from his home to the school in the morning and from the school to his home in the afternoon was for an agreed fee. In the afternoon of day in question Taylor received the boy for transportation from school to his home on Greenup Avenue, a busy and much used street, and discharged him upon the sidewalk on the opposite side of street from his home, when neither his mother nor any other person was present to receive him, and from which point to reach his home he must of necessity cross the street. The danger in so doing

was obvious and apparent and known to Taylor. Upon these unchallenged facts the Court, in asking the question, "Did Taylor, the operator of the bus, deliver the boy at a safe place?" said: "It must be kept in mind that this jitney bus was not such a vehicle for transporting passengers for hire that is operated upon a permanent track as a passenger train or a street car, nor does it run from one certain point to another, nor does it have any special platform or place to discharge passengers, but, on the other hand Taylor in operating his jitney bus could stop at any place, where it might be necessary or safe in fulfilling his duty to the passenger as a public carrier." And, continuing, the Court said: "The operator of a taxi who permits a passenger to alight from a car at a place not ordinarily used in discharging passengers and where many vehicles are accustomed to pass is not bound to warn the passengers of the danger of passing traffic nor to protect him from such danger after he has left the car . . . but under his special contract Taylor's duty as a carrier continued and required that he exercise the highest degree of care for the boy's safety until he was safely across Greenup Avenue to the side where his mother's home was located where he was out of danger of injury of the passing traffic."

Plaintiff further relies upon *Roden v. Connecticut Co.* (Conn.), *supra*. Yet we are unable to find in it support for his position. While the Court states that the care to be exercised to a young child traveling alone must be apportioned to the degree of danger inherent in his youth and inexperience, it says, "When, however, the duty of the carrier to provide a safe place to alight has been fulfilled and the passenger has left the vehicle, it ceases to owe to him any duty other than that which it owes to any person coming within the range of its activities, not to do him injury by a failure to exercise reasonable care."

Plaintiff further contends that the porter having lifted the plaintiff's intestate from the bus to the shoulder of the road before his mother alighted, it became his duty as representative of defendant Bus Corporation to retain the child in the custody he had assumed until the child's mother appeared.

In this connection, the rule is universal that ordinarily there is no duty resting upon a carrier of passengers to assist a passenger in boarding or alighting from its train or car or bus. 55 A. L. R. Annotations; *Morarity v. Traction Co.*, 154 N. C., 586, 70 S. E., 938; *Graham v. R. R.*, 174 N. C., 1, 93 S. E., 428.

Furthermore, the primary duty of caring for a child of tender years is on the parents or their representative who has the immediate custody of the child. Therefore, where such child is traveling on a bus in the care of his parent, the owner of the bus, that is, the carrier, through its employees, has the right to presume and to rely on the presumption that

WHITE v. CHAPPELL.

the parent will take such care of the child as the natural love of the parent would prompt him or her to exercise under the circumstances. 13 C. J. S., 1291, Carriers, sec. 694; *St. Louis, etc., R. Co. v. Rexroad,* 59 Ark., 180, 26 S. W., 1037.

However, the carrier is not entitled to act upon such presumption where the carrier's employees who are engaged in the operation of its bus know, or, in the exercise of reasonable care and diligence should know, that such child is or will be exposed to danger or injuries by acts or negligence of the carrier's employees.

In the instant case there is no evidence that plaintiff's intestate did anything from the time he boarded the bus until the bus stopped at the place designated by his mother except to sit in the seat by his mother. Nor is there any evidence that, in leaving his seat after the bus stopped, and in coming to the front to alight, there was anything in his manner to indicate that he was not acting with the consent, approval and confidence of his mother. Admittedly, she said nothing to put the driver and porter on notice that the boy required restraint. Although she knew the highway was much used, and knew that she and her son were going to his grandmother's on the west side of the highway, apparently she did not anticipate that he would run ahead in the dark and leave her. Should the defendant have exercised more foresight? Under such circumstances the employees of the Bus Corporation had the right to presume and to act upon the presumption that the boy was acting with the approval of his mother, from whose side he came and who followed to the door of the bus. Moreover, the Bus Corporation, having performed its duty to the intestate as an alighting passenger, was not responsible for dangers incident to intervening causes.

Finally, in the light of all the evidence we are unable to perceive any causal relation between the failure of the driver of the bus to give signal for stopping or to dim the lights on the bus or in stopping on the pavement to the right of the center of the highway, and the injury and death of intestate.

As the jury has exonerated the driver of the death car, the case resolves itself into one of those most unfortunate and deplorable accidents for which none of defendants is responsible.

The judgment is

Reversed.

DEVIN, J., dissenting: I find myself unable to agree with the disposition of this case. I think there was evidence sufficient to require the submission of the case to the jury, and to sustain the ruling of the judge below in denying the motion for nonsuit.

The evidence, considered in the light most favorable for the plaintiff, tended to show that defendant's large passenger bus, in the nighttime, stopped without signal on the paved surface of a much traveled highway, there 16 feet wide, leaving unoccupied only 8 feet of the traveled portion of the highway. Here the bus remained, with lights undimmed, for five minutes, though the shoulders of the road were wide and level. This would seem to constitute a violation of the Motor Vehicle Act of 1937, ch. 407, sec. 123 (a).

The road was straight for half a mile and the driver of the bus saw the lights of an automobile approaching from the north—an automobile which he knew would pass the bus on his left, on the unoccupied 8 feet of the highway. The bus driver knew that one of his passengers was a child, and he knew or should have known from the directions given him that the child intended to cross the highway to the left, in the path of the approaching automobile, in order to go to the home of the child's grandmother, just west of the road.

Under these circumstances, according to some of the evidence, the bus porter assisted the child off the bus to the ground, on the right side of the bus, at a time when the child was momentarily unattended, and when the child's mother was still on the bus, and this was done without any warning to the child of the danger from the automobile which was rapidly approaching. The child, in obedience to the impulsiveness of his age, dashed around the rear of the bus and across the highway, eager to reach his grandmother's, and was struck on the west edge of the highway by the automobile, and killed. The driver of the automobile, suddenly confronted by the emergency, was unable to turn to his left because that portion of the highway was occupied by the bus, and was unable to stop or avoid striking the child who was running to his right.

This evidence, it seems to me, tended to show that the defendant, in the conduct of its business as a carrier of passengers for hire, and as the operator of a motor bus on the highway, failed to perform its full duty in that it failed to exercise reasonable care for the protection of plaintiff's intestate under the circumstances, and in putting off an inexperienced child, beside the road, at an unusual place, without warning him of the known danger from an approaching automobile. The facts were known to defendant's employees and were not appreciated by the child. A word or a restraining hand would have saved a human life. I cannot agree that this was an unavoidable accident, and that the Bus Company was free from blame.

CLARKSON and SEAWELL, JJ., concur in dissent.