WALTER A. HARRIS v. ATLANTIC GREYHOUND CORPORATION.

(Filed 13 January, 1956.)

**1. Carriers § 21a—**

While a carrier is not an insurer of the safety of its passengers, and its liability to them for injury must be predicated upon negligence proximately causing the injury, the carrier owes its passengers the highest degree of care for their safety consistent with the practical operation and conduct of its business.

**2. Carriers § 21c—**

The carrier's legal duty to its passenger continues until such time as it affords its passenger an opportunity to alight safely from its conveyance to a place of safety.

**3. Trial § 22a—**

Upon motion to nonsuit, the evidence, whether offered by plaintiff or defendant, must be considered in the light most favorable to plaintiff.

**4. Carriers § 21c—**

Evidence tending to show that the driver of a bus on a rainy night slowed to a stop to permit a passenger to alight at a designated intersection, but that the bus stopped beyond the intersection at or near the edge of a ditch and parapet, that as the passenger stepped from the bus, his foot struck something soft and he was precipitated some ten feet into the ditch to his injury, *is held* sufficient to be submitted to the jury on the issue of the carrier's negligence.

**5. Same—**

Evidence tending to show that plaintiff passenger asked to alight at an intersection with which he was thoroughly familiar, that the bus slowed down and came to a gradual stop, but traveled just beyond the intersection, that plaintiff did not then know it had done so, and, assuming that the bus had stopped at the intersection where he could alight in safety and having received no warning from the bus driver, stepped from the bus into

a place of danger at the edge of a ten-foot ditch, *is held* not to disclose contributory negligence as a matter of law on part of plaintiff.

**6. Same: Trial § 31b—**

The evidence was in sharp conflict whether defendant's bus stopped for a passenger to alight at an intersection constituting a safe place, or just beyond the intersection at or near a ten-foot ditch constituting a place of danger. *Held:* It was the duty of the court to instruct the jury as to the law applicable to the variant factual possibilities presented by the evidence, and a charge defining negligence and contributory negligence in general terms is insufficient.

**7. Trial § 31b—**

It is the duty of the court and not the jury to relate and apply the law to the variant factual situations having support in the evidence. G.S. 1-180.

**8. Damages § 13a—**

The evidence was in conflict as to whether the injuries received by plaintiff in the accident caused or aggravated plaintiff's kidney condition, or whether the kidney condition subsequent to the accident was entirely unconnected with the injuries received therein. *Held:* On the question of damages for the kidney condition, the court should have instructed the jury in regard to the variant factual possibilities presented by the evidence as a substantial feature of the case, and a general instruction only to the effect that plaintiff was entitled to recover all damages which were the immediate and necessary consequences of the injuries, is insufficient.

**9. Same—**

Where the element of future damages figures largely in consideration of the issue, an instruction to the effect that the jury might take into consideration the mortuary tables as to the life expectancy of plaintiff, without reference to the evidence as to plaintiff's health prior and subsequent to the accident and without charging that the mortuary tables should be considered only as evidence together with other evidence as to the health, constitution and habits of plaintiff, is incomplete and erroneous. G.S. 8-46.

APPEAL by defendant from *Crissman, J.,* July 4, 1955, Term, of FORSYTH.

Civil action to recover damages for alleged actionable negligence.

Plaintiff, a barber by trade, worked in Winston-Salem. He lived on Bethabara Road, 500 feet west of Highway #52, sometimes called North Cherry Street Extension, a mile or more beyond the corporate limits of Winston-Salem.

Frequently, he commuted by Greyhound bus. In traveling from Winston-Salem, he got off the bus at or south of the intersection of Highway #52 and Bethabara Road. Generally, Highway #52 runs north-south and Bethabara Road runs east-west. At this intersection, there was no street light or sidewalk. There was no building at the intersection. On the east side of Highway #52, more than 100 feet

south of Bethabara Road, there was a garage, some distance back from Highway #52. Plaintiff, having crossed this intersection daily, was familiar with conditions there.

A culvert extended from the northeast corner of said intersection diagonally and under Highway #52 to the southwest corner. Through this culvert there flowed (southwesterly) a small stream. The culvert was about 10 feet high and about 8 feet wide. Before reaching the culvert, the stream ran through a deep ditch and over a bed of rock. At said northeast corner, there were concrete retaining walls extending from each end of the culvert, supporting the dirt banks of the ditch. On top of the culvert, a few feet east from the east edge of the hard surface of Highway #52, there was a low parapet or wall, the course of which was that of the culvert, with two short prongs, one parallel with Highway #52 and the other parallel with Bethabara Road. The space intervening between the hard surface of Highway #52 and the parapet, and beyond the parapet between the hard surface and the ditch embankment, was the shoulder of Highway #52.

After work on 21 January, 1954, plaintiff went to the bus station, paid his fare and boarded defendant's bus. The destination of the bus was Charleston, West Virginia. Plaintiff's ticket entitled him to transportation from Winston-Salem to Forsyth County Sanatorium, said intersection being an intermediate point. The bus left Winston-Salem at 7:20 p.m., on time, with headlights burning. It was a dark night, "smoky and drizzly."

Plaintiff was seated on the left, next to the window, in the third seat behind the driver. As the bus traveled along Highway #52, approaching said intersection, at a speed of approximately 35 miles per hour, plaintiff undertook to signal the driver that he wanted to get off at the next intersection. He pulled the cord twice, but the buzzer (signal) was out of order. Some 300 feet south of said intersection, a passenger seated beside plaintiff called to the driver that a passenger wanted to get off at the next intersection. Thereupon, the driver turned on the lights inside the bus, gradually slowed down, pulling the bus onto the right shoulder of the road and ultimately coming to a full stop. The door was opened for plaintiff to alight from the bus. He testified that he couldn't see beyond the bus steps, but assumed he was getting off at a safe place in the intersection.

Plaintiff's evidence tends to show that the driver had stopped beyond the intersection; that the place where he attempted to alight from the bus was at or near the north end of the parapet; and that, as he stepped off of the bus, his foot struck something soft and he was precipitated some ten feet onto the rock bed of the stream and knocked unconscious.

Defendant's evidence tends to show that, after the driver received notice of plaintiff's desire to get off the bus, plaintiff instructed him that he wanted to get off at the intersection; that, in accordance with plaintiff's instructions, he stopped at the intersection and plaintiff got off there, some 10 or 12 feet south of the parapet and ditch; and that plaintiff was standing in Bethabara Road, facing the driver, bidding him, "Good night," when the driver closed the door of the bus and gradually drove northward on Highway #52.

Evidence relating to plaintiff's injuries will be referred to in the opinion.

Issues of negligence, contributory negligence and damages, raised by the pleadings, were answered in plaintiff's favor; and upon the verdict the court rendered judgment that plaintiff recover from defendant damages of $35,000.00 and costs.

Defendant excepted and appealed. It assigns as error, *inter alia*, the denial of its motion for judgment of involuntary nonsuit and errors in the court's instructions to the jury.

*Ratcliff, Vaughn, Hudson, Ferrell & Carter and R. M. Stockton, Jr., for plaintiff, appellee.*

*Womble, Carlyle, Sandridge & Rice for defendant, appellant.*

BOBBITT, J. Defendant, a common carrier, was not an insurer of the safety of its passengers. Its liability, if any, was for negligence proximately causing injury to its passengers. *Hollingsworth v. Skelding*, 142 N.C. 246, 55 S.E. 212, expressly disapproving a contrary *dictum* in *Daniel v. R. R.*, 117 N.C. 592, 23 S.E. 327; *White v. Chappell*, 219 N.C. 652, 14 S.E. 2d 843; *Humphries v. Coach Co.*, 228 N.C. 399, 45 S.E. 2d 546; *Jenkins v. Coach Co.*, 231 N.C. 208, 56 S.E. 2d 571.

This Court has quoted with approval Lord Mansfield's definition of the carrier's legal duty to its passengers, *viz.:* "As far as human care and foresight could go, he must provide for their safe conveyance." *Hollingsworth v. Skelding, supra; Perry v. Sykes*, 215 N.C. 39, 200 S.E. 923; *Horton v. Coach Co.*, 216 N.C. 567, 5 S.E. 2d 828; *Smith v. Cab Co.*, 227 N.C. 572, 42 S.E. 2d 657.

The definition adopted by this Court and stated repeatedly is that a carrier owes its passengers "the highest degree of care for their safety so far as is consistent with the practical operation and conduct of its business." *White v. Chappell, supra; Humphries v. Coach Co., supra; Garvey v. Greyhound Corp.*, 228 N.C. 166, 45 S.E. 2d 58; *Jenkins v. Coach Co., supra.*

We perceive no inconsistency in these definitions. Indeed, in *Smith v. Cab Co., Devin, J.*, (later C.J.), said: "The duty owed by common

carriers to passengers being transported by them has been frequently stated by this Court to be to provide for the safe conveyance of their passengers 'as far as human care and foresight' can go, consistent with practical operation of the business." Even so, the definition quoted from *White v. Chappell, supra,* ordinarily would seem quite sufficient as a general definition.

The carrier's legal duty to its passenger continues until such time as it affords its passenger an opportunity to alight safely from its conveyance to a place of safety. *Wood v. Public Corp.,* 174 N.C. 697, 94 S.E. 459; *Loggins v. Utilities Co.,* 181 N.C. 221, 106 S.E. 822; *White v. Chappell, supra.* The passenger is entitled as stated by *Stacy, J.* (later C.J.), in the *Loggins case* to ."a safe landing," which refers to the act of the passenger in alighting from the carrier's conveyance, and to "a landing in safety," which refers to the condition in which he finds himself immediately after he has alighted from the carrier's conveyance. Once the passenger has alighted safely from the carrier's conveyance to a place of safety, the relationship of carrier and passenger ends. *Loggins v. Utilities Co., supra; White v. Chappell, supra; Patterson v. Power Co.,* 226 N.C. 22, 36 S.E. 2d 713.

In passing upon defendant's motion for judgment of nonsuit, the evidence, whether offered by plaintiff or by defendant, must be considered in the light most favorable to plaintiff. *Singletary v. Nixon,* 239 N.C. 634, 80 S.E. 2d 676; *Marshburn v. Patterson,* 241 N.C. 441, 85 S.E. 2d 683.

When the evidence is so considered, it is clear that it was sufficient for submission to the jury as to defendant's negligence. Defendant's contention is that its motion for judgment of nonsuit should have been granted because, as it contends, "plaintiff was guilty of contributory negligence as a matter of law." Conceding that the evidence was sufficient for submission to the jury as to alleged contributory negligence of plaintiff, we *do not think it* establishes plaintiff's contributory negligence so clearly that no other reasonable inference or conclusion may be drawn therefrom. *Horton v. Peterson,* 238 N.C. 446, 78 S.E. 2d 181. Hence, we concur in the court's ruling denying defendant's said motion.

In connection with the alleged contributory negligence of plaintiff, the evidence, considered in the light most favorable to him, tends to show these facts: The bus traveled beyond Bethabara Road, but plaintiff did not *then know* that it had done so; and, having received no warning from the bus driver, he stepped from the bus into a place of danger rather than of safety. The bus did not stop abruptly, but slowed down and gradually came to a stop. Plaintiff, according to the testimony of the bus driver, asked that the driver stop at said intersection; and, in getting off, assumed that the bus had stopped at said intersec-

tion, a place where he could alight therefrom in safety. But having reached the conclusion that there must be a new trial, for reasons stated below, we refrain from expanding arguments pro and con bearing upon the issues of fact.

In instructing the jury, the court reviewed what certain of the evidence offered by plaintiff and by defendant, respectively, tended to show, and reviewed the contentions of the respective parties. Definitions of a carrier's duty to its passenger to and including the passenger's alighting safely from the conveyance to a place of safety, quoted from the *Hollingsworth, Loggins, and White cases,* cited above, were given; and in addition the court gave correctly the law as to burden of proof and general definitions of negligence, contributory negligence and proximate cause.

Then, in *charging* the jury as to the negligence issue, the court's instruction was: ". . . the Court charges you that if you find from this evidence, all of this evidence, and by its greater weight, that the defendant was negligent on this occasion, as the Court has defined negligence to you, and that that negligence was the proximate cause of the injuries sustained by the plaintiff, as the Court has defined proximate cause, taking into consideration the duty that the defendant as a carrier owed to the plaintiff as a passenger, as the Court has defined that duty from the decisions of our Court, then it would be your duty to answer this first issue 'Yes.' If you are not so satisfied, then it would be your duty to answer it 'No.'"

And, in *charging* the jury as to the contributory negligence issue, the court's instruction was: "The Court charges you that the burden is on the defendant to satisfy you by the greater weight of the evidence that there was negligence on the part of the plaintiff which contributed to his injuries, in order that it would justify you in answering this second issue 'Yes.' If you are not so satisfied from all of this evidence and by its greater weight, then you'd answer that second issue 'No.'"

Earlier in the charge, the court had instructed the jury as follows: "Now, Members of the Jury, the law provides that the Judge declare or explain to you the law in the case. It, therefore, becomes the duty of the Court, that is, the one speaking to you now, to relate to you the law that is applicable in this case. You will apply the facts to the law in making up your answer to the issues."

G.S. 1-180 provides, in part, that the trial judge, in giving the charge to the petit jury, either in a civil or a criminal action, shall declare and explain the law arising on the evidence given in the case. The court, not the jury, is to *relate and apply* the law to the variant factual situations having support in the evidence. *Bank v. Phillips,* 236 N.C. 470, 73 S.E. 2d 323, and cases cited.

Analysis of the evidence discloses sharp conflict as to where plaintiff alighted from the bus. If plaintiff alighted therefrom safely at the intersection 10 or 12 feet south of the parapet and ditch, and was standing there when the bus drove away, and thereafter, notwithstanding he was thoroughly familiar with the lay of the land at said intersection, for some unexplained reason or none walked or wandered over to the edge of the ditch and fell in, the defendant would not be guilty of negligence proximately causing plaintiff's injuries.

On the other hand, if the bus went beyond the intersection and plaintiff was invited or directed to alight therefrom at or near the edge of the ditch and parapet, then a factual situation calling for an application of other principles of law was presented. In such case, it would be for the jury to say whether the bus driver failed to exercise due care to stop at a place where plaintiff might alight safely from the bus to a place of safety or to warn plaintiff of a danger of which the bus driver was aware, or of which he should have been aware had he exercised due care; and in relation to the contributory negligence issue, it would be for the jury to say whether plaintiff knew, or by the exercise of due care should have known, that the bus had passed the intersection and was in the vicinity of the ditch and parapet when he undertook to alight from the bus and whether in alighting from the bus under such circumstances he failed to exercise due care for his own safety when he could not see where he was stepping.

Careful consideration of the charge fails to disclose that the court gave instructions of law applicable to these variant factual possibilities or approximating the analysis set out above.

Defendant, while it excepted to and assigned as error the court's instruction that it was for the jury to "apply the facts to the law in making up your answers to the issues," it would seem that this position was brought forward in the brief only in relation to two specific features of the charge, both bearing on the issue of damages, referred to below.

Unquestionably, plaintiff's evidence tends to show that he received serious injuries as the direct and proximate result of his fall; and there is ample evidence that the injury to his collar bone is permanent and partially disabling. From 21 January, 1954, to 10 February, 1954, he was in the hospital, for some days in critical condition; and during this time he was treated exclusively for injuries directly and obviously caused by his fall on 21 January, 1954. In the course of examinations then made, pus cells in his urine were detected. Later, on account of the continuance of this kidney condition, Dr. Andrew, who had previously treated plaintiff for kidney trouble, was called in to take charge of this feature of plaintiff's condition. From 31 March, 1954, to 3 April, 1954, plaintiff was in the hospital for a complete study of his urinary tract. It was

found that the left kidney was obstructed. Conservative treatment was given. Plaintiff was in the hospital again from 20 June, 1954, to 25 June, 1954, when a further study was made. No improvement had resulted from the original conservative treatment. Again, conservative treatment failed to bring about any improvement; and on 14 July, 1954, plaintiff returned to the hospital, at which time his left kidney, which was practically destroyed, was removed. Plaintiff was in the hospital from 14 July, 1954, to 27 July, 1954. These three visits to the hospital were solely in connection with plaintiff's kidney trouble.

Dr. Rabil, who treated plaintiff for injuries (other than kidney trouble) resulting from his fall, testified that in his opinion the injury on 21 January, 1954, and plaintiff's bedfast condition during treatment therefor, "aggravated a pre-existing kidney condition." Dr. Andrew, who had treated plaintiff for kidney trouble in 1946 and who made the examinations and performed the operation in 1954, had a different view. Dr. Andrew, plaintiff's urologist and surgeon, was called as a witness by defendant. In his opinion, examinations made in the hospital in January-February, 1954, simply brought to the attention of the doctors then treating him the existence of plaintiff's pre-existing kidney trouble. He testified: "The accident he had on January 21, 1954, did not have anything to do with the destruction of his kidney or with the necessity for the removal of his kidney. The destruction of the kidney was the result of the obstruction. Mr. Harris was born with that condition existing; it was a congenital abnormality. That continued to grow worse through the years, until this finally developed."

Much emphasis was placed upon these visits to the hospital, plaintiff's loss of time, etc., incident to his kidney condition. The record shows that plaintiff displayed his scars resulting from this operation to the jury.

In charging the jury on the third issue, the court made no reference to the sharply conflicting evidence as to whether plaintiff's fall aggravated a pre-existing kidney condition or had nothing whatever to do with it; and no instruction of law was given with reference thereto. True, in the course of general instructions, the court instructed the jury that, if plaintiff was entitled to recover at all, he was entitled to recover for all injuries, "in consequence of the defendant's wrongful or negligent acts," and again such as were "the immediate and necessary consequences of the injury." We are constrained to hold that the disputed issue as to whether plaintiff's kidney condition was caused by his fall on 21 January, 1954, was a substantive feature of the controversy of such importance that it was incumbent upon the court to instruct the jury directly in relation thereto. We think the jury should have been

so instructed even in the absence of a specific request therefor. *Bank v. Phillips, supra,* and cases cited.

Unless the plaintiff's kidney condition and operation were caused or aggravated by the fall on 21 January, 1954, the jury should have disregarded such kidney condition and operation. It was for the jury to say whether plaintiff's pre-existing kidney condition was aggravated by the fall on 21 January, 1954, and if so, to award damages only to the extent they found such pre-existing kidney condition had been aggravated by the fall on 21 January, 1954. It would seem that the court should have instructed the jury specifically bearing upon this important phase of the case.

Plaintiff was out of work from 21 January, 1954, to 27 August, 1954, except for two brief periods, namely, from May 26th to June 19th and from June 26th to July 13th. Plaintiff's hospitalization in connection with his kidney examinations and operation occurred before his final return to work on August 27th.

When he did go back to work in the barber shop in the Robert E. Lee Hotel, where he worked on a commission basis, there is much evidence that, primarily on account of the fractured collar bone, he was permanently injured, suffering a general disability with relation to his occupation of 33%; that he could then work slowly, for short periods and under considerable difficulty; that his condition was such that it would tend to become worse rather than better; that in the future, during his lifetime, he would suffer damages on account of disability, pain and suffering, loss of earnings, etc. The mass of evidence bearing upon the permanency and character of plaintiff's injury shows clearly that future damages figured largely in the consideration of the issue as to damages.

The record shows: "The plaintiff introduced into evidence from the General Statutes of North Carolina, Section 8-46, being the mortuary tables, that portion which reads as follows: 'Completed Age, 57, Expectation, 16.1 years.'"

There was other evidence, some favorable and other unfavorable to plaintiff, bearing upon his health prior to as well as subsequent to his fall on 21 January, 1954.

In arriving at plaintiff's life expectancy, a vital factor incident to the determination of future damages and the present value thereof, the instruction was: ". . . the Court charges you that . . ., if you come to consider this third issue, you may take into consideration the mortuary tables which were introduced as to the life expectancy of the plaintiff in this case, . . ." The court then added: "and that you may take into consideration all of the evidence that has been introduced here as to plaintiff's losses from work, his loss from his earnings, and the expense that he has been put to by hospital, doctor and medical

bills, and his mental suffering, his bodily suffering, that in the past and take into consideration that which he may suffer in the future, as the Court has just related to you." It will be noted that the additional instruction thus quoted, which immediately follows the reference to the mortuary tables, deals solely with other aspects of damages, not with the determination of life expectancy.

The instruction is incomplete and erroneous. G.S. 8-46 expressly provides 'that the statutory mortuary tables "shall be received in all courts and by all persons having power to determine litigation, as evidence, with other evidence as to the health, constitution and habits of such person, . . ."

The reference to the mortuary tables is the only reference in the charge, either by way of statement of law or by way of statement of contentions, bearing upon the life expectancy of plaintiff. Failure to instruct the jury that it was for the jury to determine the life expectancy of plaintiff, based upon the evidence as to his health, constitution and habits, in conjunction with which the mortuary tables were also for consideration *as evidence,* was calculated to convey the impression that the mortuary tables constituted the sole guide for the jury and were determinative.

Upon the evidence in this record, the issues of negligence, contributory negligence and damages were for jury consideration. But we are constrained to hold that the error in the instruction relating to the mortuary tables, and the failure of the court to declare and explain the law arising on conflicting evidence relating to crucial and sharply disputed questions of fact, were of such prejudicial effect as to necessitate a new trial. It is so ordered.

New trial.