PERNELL R. MANN v. VIRGINIA DARE TRANSPORTATION COM-
PANY, INCORPORATED, AND CAROLINA COACH COMPANY

— AND —

SALLIE BAUM TILLETT v. VIRGINIA DARE TRANSPORTATION
COMPANY, INCORPORATED, AND CAROLINA COACH COMPANY

No. 35

(Filed 31 August 1973)

**1. Carriers § 19— common carrier — liability for injury to passenger**

While a common carrier is not an insurer of its passengers and
is liable only for negligence proximately causing injury to them, such
carrier owes to the passengers whom it undertakes to transport the
highest degree of care for their safety so far as is consistent with
the practical operations and conduct of its business.

**2. Carriers § 19— common carrier — nondelegable duty to passengers**

The high degree of care which a carrier operating under a public
franchise owes to its passengers is a nondelegable duty.

**3. Carriers § 19— passenger carrier — inspection of equipment**

A common carrier of passengers has the duty to provide adequate
conveyances with sufficiently strong and serviceable equipment for the
safe transportation of its passengers, to inspect such conveyances and
equipment at proper intervals and to keep them in good repair.

**4. Carriers § 19— passenger carrier — duty to inspect equipment — pur-
chase from reputable source — lease from another carrier**

The purchase of equipment from a reputable source does not re-
lieve the carrier of the further duty to inspect and test the equipment;
nor may a carrier relieve itself of the duty to exercise the highest de-
gree of care to provide safe buses by leasing its transportation facili-
ties from another carrier or corporation which has contracted to
furnish and keep such equipment in proper condition.

**5. Carriers § 19— lease of bus — pre-existing defect — liability for injury
to passenger**

If a bus leased to a common carrier contained a pre-existing defect
which could or should have been discovered by proper inspection, and
if the defect was the proximate cause or a proximate cause of injuries
to passengers on the bus, the common carrier would be liable for such
injuries.

**6. Carriers § 19— bus running off highway — negligence by bus com-
pany — prima facie case**

Plaintiff bus passengers made out a *prima facie* case of actionable
negligence against defendant carrier by the introduction of evidence
tending to show that they were injured when the bus in which they
were passengers, without a prior collision or other apparent cause, ran
off the highway into a ditch and struck a culvert.

Mann v. Transportation Co. and Tillett v. Transportation Co.

**7. Appeal and Error § 42— omission of charge from record — presumptions**

Where the judge's charge is not in the record, it is presumed that he submitted the case to the jury upon every theory which the evidence justified and instructed correctly on every principle of law applicable to the facts.

**8. Evidence § 49— expert opinion testimony as to causation**

When a jury's inquiry relates to cause and effect in a field where special knowledge is required to answer the question, the purpose of expert testimony is likely to be thwarted or perverted unless the expert witness is allowed to express a positive opinion as to causation rather than being confined to testimony as to whether a particular event or condition "could" or "might" have produced the result in question.

**9. Carriers § 19— bus running off road — defect in steering mechanism — sufficiency of evidence**

In an action to recover for injuries received by plaintiff bus passengers when the bus ran off the highway into a ditch and struck a culvert, the evidence was sufficient to support a finding that a defective steering mechanism caused the bus to leave the highway where there was evidence tending to show that as the bus approached the curve in which it left the road and after it left the road the wheels would not respond when the driver turned the steering wheel, and where there was expert testimony that the nuts on two bolts connecting the flanges in the steering mechanism were stripped and, in consequence, the bolts became loose and moved back and forth, that this movement finally severed the cotter pin at the end of each bolt, breaking the connection between the power steering cylinder and the steering arm, and that there would be no steering power available to the wheel upon the separation of the flanges.

**10. Bailment § 5; Carriers § 19— bailor of bus used by common carrier — duty of inspection — liability to carrier and third person**

The owner of a nine-year-old bus leased to a common carrier had the duty to have it inspected carefully by a qualified mechanic before it was delivered to the carrier; this duty was imposed by law as well as by contract with the carrier, and its breach would render the owner liable not only to the carrier but also to a third person injured thereby.

**11. Carriers § 19; Evidence § 54— expert opinion that defects would be visible to competent mechanic — admissibility**

In this action to recover for injuries to passengers on a bus leased by defendant common carrier from the defendant owner, the trial court committed prejudicial error in the exclusion of testimony by defendant carrier's expert mechanic that, based upon his personal examination of the steering mechanism of the bus, it was his opinion that the conditions which he found and described (and upon which he based his conclusion that a defect in the steering mechanism caused the accident in question) would have been visible to a competent mechanic prior to the time the bus was delivered to defendant carrier on the day of the accident, that the condition must have existed during two or three

Mann v. Transportation Co. and Tillett v. Transportation Co.

thousand miles of operation before it could have caused the steering to fail, and that the condition would have been visible to a trained mechanic by the looseness between the two flanges of the steering cylinder and the steering rod and by the cracking of the dirt, dust and road accumulation in the joint.

12. **Bailment § 6; Carriers § 19— injuries to passengers on leased bus — liability of bus owner to carrier**

In an action to recover for personal injuries received by passengers on a bus leased by defendant common carrier from the defendant owner when the bus ran off the highway and struck a culvert, the owner would not be liable to the carrier in any amount if the jury should find that the bus left the highway solely because of negligence by the carrier's driver or that the bus left the highway because of a defect in the steering mechanism which could not have been discovered by the owner in the exercise of proper care prior to delivery of the bus to the carrier.

13. **Bailment § 6; Carriers § 19; Negligence § 11— injury to bus passengers — leased bus — pre-existing defect — indemnity of carrier by owner**

In an action to recover for personal injuries received by passengers on a bus leased by defendant common carrier from defendant owner, the common carrier would be entitled to recover indemnity from the owner if the jury should find that the accident was caused by a pre-existing defect in the steering mechanism which a competent mechanic could and should have discovered by a proper inspection of the bus prior to its delivery to the common carrier, since the negligence of the owner was primary and that of the common carrier in failing to provide a safe bus for its passengers was secondary.

14. **Bailment § 6; Carriers § 19; Torts § 2— injuries to bus passengers — leased bus — contribution by owner to carrier**

In an action to recover for injuries received by passengers on a bus leased by defendant common carrier from defendant owner, the common carrier would be entitled to contribution from the owner if the jury should find that the owner was guilty of actionable negligence in furnishing the carrier with a defective bus, that the carrier's driver was negligent in the manner in which he operated the bus, and that the negligence of both concurred in proximately causing the accident in which plaintiffs were injured. G.S. 1B-1; G.S. 1B-3.

APPEAL by defendant, Virginia Dare Transportation Company, under G.S. 7A-30(2), from the decision of the Court of Appeals affirming the judgment of *Tillery, J.*, entered at the 10 April 1972 Civil Session of DARE.

These two actions for personal injuries arose out of the same occurrence and were consolidated for trial. The following facts are undisputed:

On 17 September 1968, about 1:00 p.m., plaintiffs Mann and Tillett were paying passengers on a bus being operated by Robert L. Gibbs, an employee of defendant Virginia Dare Transportation Company (Transportation Company) on a regularly scheduled trip from Manteo, North Carolina, to Norfolk, Virginia, via Elizabeth City, North Carolina. The day was clear and the highway was dry. At a point on N. C. Highway No. 34 about 4½ miles south of Currituck Courthouse, the asphalt highway curves slightly to the west through flat, open country. The bus entered but failed to follow this curve to the left. Instead, the marks showed the bus went off onto the right shoulder of the road "in the point of curve." The marks led onto the 12-15 foot shoulder, "continued along the shoulder northward," gradually bearing into the ditch. The bus went down the ditch, or partially on the shoulder and partially in the ditch, for 225 feet and struck a culvert. When it hit the culvert the bus "jumped up in the air, and went over [it]"; the force of the impact "popped out" both windshields. Thereafter, completely out of control, it continued down the ditch for 219 feet before coming to a gradual stop.

When the bus came to a stop both plaintiffs had received injuries which required their hospitalization.

The 1959 GMC bus, which was owned by defendant Carolina Coach Company (Coach Company), had been leased to Transportation Company. The lease required Coach Company to furnish Transportation Company "sufficient buses to operate three (3) roundtrip schedules daily between Norfolk, Virginia, and Manteo, North Carolina, said buses to be complete with tires, gas, and oil, or diesel fuel, and complete maintenance including repairs for mechanical road failures." Transportation Company's bus drivers were required to accept the buses which Coach Company delievered to them and to report any mechanical defects to Coach Company.

Each plaintiff sued both Transportation Company and Coach Company, alleging that she was injured by their joint and concurring negligence as specified in her complaint. Each defendant denied plaintiffs' allegations as to its negligence, pled the sole negligence of the other defendant as the cause of the accident, and set up cross actions under G.S. 1A-1, Rule 13(g) against the other for "complete indemnity or for contribution" as the facts might warrant in the event an issue of negligence was answered against it.

· Transportation Company alleged that the bus left the highway because of a sudden and totally unexpected failure of its steering mechanism; that Coach Company had negligently failed to inspect, discover, and repair the defective steering mechanism before delivering the bus to Gibbs, thereby breaching its duty to furnish Transportation Company a safe and properly working vehicle. It alleged Coach Company's primary liability to plaintiffs and, in the alternative, Coach Company's liability for contribution in the event negligence on the part of Gibbs was found to be a proximate cause of plaintiffs' injuries.

Coach Company alleged that it had furnished Transportation Company a bus in "excellent condition," and that it had been carefully inspected, maintained, and checked to be certain that it met all safety requirements and had no mechanical defects; that if Gibbs drove the bus into a ditch and over a culvert Transportation Company was solely responsible for his negligence; that Transportation Company had contracted to indemnify Coach Company against any liability on account of its negligent operation of Coach Company's leased buses. In the alternative, Coach Company alleged that, if it should be shown to have been guilty of actionable negligence, Transportation Company was a joint tort-feasor and liable to contribute to plaintiffs' recovery.

Plaintiff Mann's version of the events preceding the accident is as follows: Gibbs stopped the bus at Caleb Poyner's filling station in Barco and procured "a soda and a cake." He ate the cake and drank the soft drink as he was driving "and then he stuck the bottle out the window just like he was going to throw the bottle out, and the bus ran off the road."

On cross-examination she testified, "While the bus was on the shoulder the driver was trying to pull the bus back on the road. He was trying to pull it but the bus wouldn't come. . . . [H]e was turning the steering wheel to his left. But the bus wouldn't go back, and the bus went onto the shoulder and got up there to the place that has been referred to as where there was a culvert and went on to where it stopped. And the driver never was able to get it back on the pavement though he was pulling the wheel to the left. The shoulder was fairly level. The bus went along on the shoulder for a couple of hundred feet or so before it got to the ditch where the culvert was. He was throwing the Coca-Cola out the window with his left hand—and the bus ran off on the right."

Plaintiff Tillett was unable to say how the accident happened, and the third passenger on the bus did not testify.

The investigating officer, Highway Patrolman B. G. Price, as a witness for plaintiff, testified, *inter alia,* that the bus was extensively damaged on its right side, underneath as well as where the body had struck the culvert, and the windshield was out; that he was able to turn the steering wheel all the way around; that it spun around but did not turn the front wheels of the bus; that when he asked Gibbs "what happened to cause the accident" Gibbs' reply was that he did not know—he did not say that the steering mechanism of the bus had failed.

At the conclusion of plaintiffs' evidence, Coach Company moved for a directed verdict in each case because (1) plaintiffs had not shown that there was any mechanical defect in the bus at the time it was delivered to Transportation Company; and (2) Coach Company was not liable for the negligence of the driver of the bus, an employee of Transportation Company. Judge Tillery allowed Coach Company's motions and entered judgments that each plaintiff have and recover nothing of defendant Coach Company.

Transportation Company's motion for a directed verdict, made on the ground that plaintiffs had failed to make out a prima facie showing of actionable negligence, was denied. Transportation Company then offered evidence which tended to show:

At 6:00 a.m. on 17 September 1968, at its garage in Norfolk, Coach Company delivered to Gibbs the bus which was later involved in the accident in suit. It was a substitute bus which Gibbs had not driven before. From Norfolk, he drove his regular 113-mile route to Manteo, a round trip which he made three times a week. On this day he arrived at Manteo at 9:10 a.m. and left there on the return trip to Norfolk at 11:30 a.m. After having made six regularly scheduled stops, the last being at the Coinjock post office to pick up the mail, Gibbs did not stop again until the bus came to rest in the ditch after the accident. He did not stop at Poyner's filling station or at any other place in the Barco community. At no time during the journey did he have in his possession any soda, Coca-Cola, or cake.

The bus approached the "left curve" about 4½ miles from the Currituck Courthouse at a speed of about 55 MPH. When Gibbs turned the steering wheel to the left in order to round the curve the wheels did not respond. The bus continued on a

straight course as he continued to turn the steering wheel to the left. He applied the brakes as soon as he saw the bus was not making the turn as it should and before the bus left the pavement. Then he let up on the brakes and applied them again. The right wheels of the bus went into the ditch, and the bus left brake marks on the shoulder as it traveled approximately 200 feet down the ditch before it hit a culvert. After it struck and went over the culvert, the bus was entirely out of control; it then traveled about 200 feet before coming to a gradual stop with the front end sitting up on the road embankment.

On the trip from Norfolk to Manteo and the 45-mile run from Manteo to the scene of the accident Gibbs experienced no difficulty in driving or steering the bus. Until he arrived at the "left curve," he had suspected no trouble. Gibbs testified that he told Patrolman Price he did not know what happened but that something went wrong with the steering wheel.

Leonard D. Quidley, another bus driver employed by Transportation Company who happened to be in the vicinity at the time of the wreck, arrived at the scene ten minutes before the highway patrolman. In response to his questions Gibbs told him that he did not know what happened; "that the steering wheel made no contact with the wheels." Quidley then turned the steering wheel and ascertained that the front wheels did not turn with it. This bus was equipped with power steering. The bus was damaged on the right front and side with "right much damage" under the right side.

Interrogatories answered by Coach Company's president provided the following information: The bus was removed from the ditch about noon on the day following the accident, 18 September 1968. It was towed to Coach Company's garage in Norfolk where a general inspection was made of all damage to the bus. There two bolts were removed from the booster flange of the steering mechanism. These bolts were steel, 3/8ths of an inch wide and 1⅓ inches long and U.S.S. thread. No repairs were made to the bus until sometime after 1 October 1968 when the bus was removed to Coach Company's garage in Raleigh. Final repairs were completed about 15 December 1968.

Transportation Company examined as a witness John C. Jeffries, whom the court found to be an expert mechanic and a mechanical damage analyst. His testimony, except when quoted, is summarized as follows:

On 23 September 1968 Coach Company's supervisor of maintenance showed Jeffries the two bolts which had been removed from the booster flange of the bus' power steering mechanism. There were no nuts with the bolts at the time Jeffries examined them, and he never saw the nuts. He found "small rings of steel intertwined in the threads of the bolts that made the bolts move on the outside of the thread, and there were several of these small rings of steel intertwined in there that were loosely fitting in the thread. At the time of [his] examination, the small steel rings that were intertwined were not a part of the bolt. The intertwined steel rings in the threads of the bolt, in [his] opinion, were the threads from the nuts that had been on the bolts at one time."

On 11 October 1968 Jeffries examined the bus itself. He found it "heavily damaged on the right front section, and along the right side; the step well and the entrance door opening were badly misaligned. The floor was buckled and the power steering cylinder was disconnected from the extension to the steering arm."

In the power steering mechanism of this bus the booster flange, a three-inch square steel plate on the power steering cylinder, is an integral part of the cylinder. It extends the cylinder to the steering arm, which also has a square flange corresponding exactly with the flange on the power steering cylinder. Holes, three-eights of a inch in diameter, in each of the four corners of both the power steering cylinder's flange and the steering-arm flange permit them to be bolted together. "The purpose in having the two flanges together is so that the power of the manual steering and the hydraulic steering both could be transmitted to the wheel. If the flanges were not together or should become separated then there would be no steering power available to the wheel. . . . [Jeffries] examined the flanges and found no damage except wear in the holes . . . where the bolts went through; there was some evidence of wear in the holes. There was not any visible exterior damage to the power cylinder . . . at the time [he] examined it. There was not any visible exterior damage to the power cylinder. . . ."

In answer to a hypothetical question based (1) upon the assumption that on 17 September 1968 Gibbs had driven the bus 158 miles without any difficulty prior to the time it left the pavement of Highway No. 34 and ran into a ditch when the front wheels failed to respond to the turning of the steering

wheel as the bus entered a slight curve at 55 MPH; and (2) upon his personal examination of the steering system of the bus and the two bolts which had been removed from it, Jeffries testified that he had an opinion as to what could or might have caused the steering system to fail. He said:

"My opinion is that the nuts, when they were placed on the bolts and tightened, were tightened to a point beyond the torque, or the point of pressure to tighten the bolts that is recommended, and that as a result the thread in the nut stripped, leaving the small pieces of the thread in the nut on the bolt, and the nut therefore became loose and would move back and forth to some extent, the cotter pin, which goes through the small hole at the end of the bolt, would have sheared, it is made of a very soft material, the pressure would shear this cotter pin, it is very small and made of very soft material, shear it off, and the connection is broken."

Thereafter, upon Coach Company's objection, the court excluded Jeffries proffered opinion that a reasonable inspection by a competent mechanic would have discovered the loose bolts which connected the flanges prior to the time the bus was delivered to Gibbs.

At the conclusion of Transportation Company's evidence, Coach Company moved for directed verdicts on Transportation Company's cross actions for indemnity or contribution upon the following grounds:

(1) The evidence disclosed no negligence on the part of Coach Company which was the proximate cause of the accident in suit;

(2) The evidence failed to establish that the bus was delivered to Transportation Company in an unsafe condition; or

(3) If the evidence did establish a mechanical defect in the steering mechanism of the bus at the time of delivery, it was a defect which Coach Company could not have discovered by reasonable inspection.

The motion was granted and judgment entered that Transportation Company have and recover nothing of Coach Company. Each plaintiff's case was submitted to the jury on the issues of Transportation Company's negligence and plaintiffs' damages. The jury answered the issues in favor of plaintiffs, and judgments were entered that each plaintiff recover $10,000.00

against Transportation Company. Transportation Company did not appeal from the judgments entered upon these verdicts, but it did appeal from the judgments dismissing its cross actions against Coach Company.

The Court of Appeals held that Transportation Company had offered no competent evidence either that Coach Company knew of any defect in the steering mechanism of the bus when it delivered the bus to Gibbs on 17 September 1968 or that, by the exercise of reasonable care, it could have discovered any such defect prior to the accident. *See Mann v. Transportation Company* and *Tillett v. Transportation Company,* 17 N.C. App. 256, 194 S.E. 2d 164 (1973). One member of the panel having dissented, Transportation Company appealed to this Court as a matter of right.

*J. Kenyon Wilson, Jr.; White, Hall & Mullen by Gerald F. White and John H. Hall, Jr., for Virginia Dare Transportation Company, Incorporated, defendant appellant.*

*James, Speight, Watson and Brewer by W. W. Speight and William C. Brewer, Jr.; Allen, Steed and Pullen by Arch T. Allen III, for Carolina Coach Company, defendant appellee.*

SHARP, Justice.

Transportation Company's liability to plaintiffs has been finally determined. It did not appeal from the judgments which plaintiffs recovered against it on account of the injuries they sustained in the bus accident in suit. This appeal presents the questions (1) whether Transportation Company offered any evidence tending to show that negligence on the part of Coach Company caused the bus accident in which plaintiffs were injured; and (2), if so, whether Coach Company's liability to Transportation Company is for indemnity or contribution.

[1] Transportation Company, a common carrier, is not an insurer of its passengers; it is liable only for negligence proximately causing injury to them. However, a carrier owes to the passengers whom it undertakes to transport "the highest degree of care for their safety so far as is consistent with the practical operations and conduct of its business." *White v. Chappell,* 219 N.C. 652, 659, 14 S.E. 2d 843, 847 (1941). *See Harris v. Greyhound Corp.,* 243 N.C. 346, 90 S.E. 2d 710 (1956); *Garvey v. Greyhound Corp.,* 228 N.C. 166, 45 S.E. 2d 58 (1947); 14 Am. Jur. 2d *Carriers* § 918 (1964).

[2] The high degree of care, which a carrier operating under a public franchise owes to its passengers, is a nondelegable duty. *See Pennsylvania Co. v. Roy,* 102 U.S. 451, 26 L.Ed. 141 (1880); *Dixie Stage Lines v. Anderson,* 222 Ala. 673, 134 So. 23 (1931); *Colton v. Ship-by-Truck Co.,* 337 Mo. 280, 85 S.W. 2d 80 (1935); *Simpson v. Gray Line Co.,* 226 Ore. 71, 358 P. 2d 516 (1961). *See also Morgan v. Chesapeake & Ohio Ry. Co.,* 127 Ky. 433, 105 S.W. 961 (1907); *Western Maryland R. R. v. State,* 95 Md. 637, 53 A. 969 (1902); *Virgil v. Riss & Co.,* 241 S.W. 2d 96 (Mo. App. 1951); Prosser, *Law of Torts* 470 (4th ed. 1971); 41 Am. Jur. 2d *Independent Contractors* § 39 (1968). "[A] passenger who sustains an injury by reason of the fact that the obligatory measure of care was not exercised is entitled to hold the carrier responsible, although the conditions or occurrences which caused the injury resulted from the negligence of an independent contractor." Annot., 29 A.L.R. 736, 784 (1924).

[3, 4] "Among the duties falling upon a common carrier of passengers are the important ones of providing adequate conveyances with sufficiently strong and serviceable equipment for the safe transportation of its passengers, and of inspecting such conveyances and equipment at proper intervals and keeping them in good repair." 14 Am. Jur. 2d *Carriers* § 1028 (1964). *See* 13 C.J.S. *Carriers* § 735 (1939). The purchase of equipment from a reputable source "does not relieve the carrier of the further duty to inspect and test the equipment or appliances, and hence where an accident results from a defect which might have been discovered by a proper test made by the carrier, it is liable therefor." 14 Am. Jur. 2d *Carriers* § 1030 (1964). Nor may a carrier relieve itself of the duty to exercise the highest degree of care to provide safe buses by leasing its transportation facilities from another carrier or corporation which has contracted to furnish and keep such equipment in proper condition. "[T]he carrier cannot delegate the performance of this duty and escape liability for its nonperformance." 13 C.J.S. *Carriers* § 741(a) (1939). *See* 14 Am. Jur. 2d *Carriers* § 898 (1964).

[5] Thus, if the bus which Coach Company delivered to Gibbs on the morning of September 17, 1968 contained a pre-existing defect in the steering mechanism which could or should have been discovered by a proper inspection, and if the defect was the proximate cause or a proximate cause of plaintiffs' injuries, Transportation Company would be liable to plaintiffs.

In *Simpson v. Gray Line Co., supra,* the plaintiff passenger was injured in a bus accident which occurred when a tire blew out. The defendant bus company attempted to avoid liability by showing that its tires were rented from a third party. The Oregon Supreme Court said: "[T]his fact [was] immaterial in determining the issue before the court. There is a duty upon the carrier to furnish tires that are fit for the intended use. . . ." *Id.* at 74, 358 P. 2d at 517. "[T]he defendant-carrier could not delegate its duty to a third party, *i.e.,* to a tire company which supplied tires on a rental agreement. *Pennsylvania Co. v. Roy, supra.* . . ." *Id.* at 76, 358 P. 2d at 518.

[6, 7] Plaintiffs in this case made out a prima facie case of actionable negligence against Transportation Company by the introduction of evidence tending to show that they were injured when the bus in which they were passengers, without a prior collision or other apparent cause, ran off the highway into a ditch and struck a culvert. *Greene v. Nichols,* 274 N.C. 18, 161 S.E. 2d 521 (1968); *Simpson v. Gray Line Co., supra;* 2 Stansbury, *North Carolina Evidence* § 227 (Brandis rev. 1973); Annot., 79 A.L.R. 2d §§ 23 (b), 31 (a) (1961); 14 Am. Jur. 2d *Carriers* § 1161 (1964); 13 C.J.S. *Carriers* § 764 (f) (4) (1939). Thus, plaintiffs would have been entitled to go to the jury as against Transportation Company without plaintiff Mann's testimony that the bus driver consumed "soda and cake" while operating the bus and then threw or attempted to throw the bottle out the window just before the bus ran off the highway. The jury, therefore, was not required to accept this testimony in order to answer the issues in favor of plaintiffs. We, of course, cannot know upon what theory the jury answered the issues of negligence in favor of the plaintiffs. The judge's charge is not in the record, but the presumption is that he submitted the case to the jury upon every theory which the evidence justified and "instructed correctly on every principle of law applicable to the facts." *Jones v. Mathis,* 254 N.C. 421, 428, 119 S.E. 2d 200, 205 (1961).

The specific questions which determine this appeal are (1) whether Transportation Company offered evidence sufficient to sustain a finding that a defect in the steering mechanism caused the leased bus to leave the highway; and (2), if so, whether Coach Company, in the exercise of proper care under the circumstances, could have discovered the defect prior to the time it delivered the bus to Gibbs.

On Coach Company's motion for a directed verdict all the evidence which tends to support Transportation Company's case against it must be taken as true and considered in the light most favorable to Transportation Company. Transportation Company is entitled to the benefit of every reasonable inference which may legitimately be drawn from the evidence. *Kelly v. Harvester Co.*, 278 N.C. 153, 179 S.E. 2d 396 (1971) ; *Bowen v. Gardner*, 275 N.C. 363, 168 S.E. 2d 47 (1969) ; Phillips, 1970 Supplement to 2 McIntosh, *N. C. Practice and Procedure* § 1488.15. Therefore, on this motion, Gibbs' statement that he neither threw nor attempted to throw a bottle from the bus and had no cake or soft drink on the bus at any time during the trip on which plaintiffs were injured must be accepted as true, and plaintiff Mann's testimony that the bus ran off the road just as Gibbs prepared to throw a soda bottle out the window must be disregarded. It follows that, for the purpose of this motion, the only evidence of negligence on the part of Transportation Company is the fact that the bus suddenly left the highway in a curve.

Gibbs' testimony negated any negligence in his manner of operating the bus. His statement that, as he approached the curve in which the bus left the road, he turned the steering wheel as usual but "the wheels did not answer to the steering wheel"; that although he kept turning the wheel to the left and applied his brakes, the bus kept to the right and into the ditch was corroborated by plaintiff Mann. She said that before the bus went into the ditch the driver was trying to pull it back onto the road but it would not come; that "he was turning the steering wheel to his left but the bus wouldn't go back and the bus went on the shoulder. . . ."

The foregoing evidence tends to show that a defect in the steering mechanism caused the bus to go into the ditch and to negate Coach Company's contentions (1) that the steering gear was damaged by its collision with the culvert, and (2) that "there was absolutely no evidence of any defect existing prior to the accident."

The evidence does not show the exact date on which repairs began. Coach Company's president, in answer to interrogatories not specifically directed to this point, said that the repairs were not begun until after 1 October 1968, and they were completed about 15 December 1968. It is a fair inference that repairs had not been begun at the time Transportation Company's expert

damage analyst, Mr. Jeffries, examined the bus on 11 October 1968. At that time the whole right front section and the right side of the body was damaged and misaligned; the floor of the bus was buckled and the power steering cylinder disconnected from the extension of the steering arm. Nothing he saw suggested that any repairs had then been made or attempted.

Interrogatories answered by Coach Company's president on 23 March 1972 disclosed that on the day after the accident the bus was towed from the scene of the accident to Coach Company's garage in Norfolk. Coach Company found no missing parts from the steering mechanism at the scene.

On the day after the accident, in Norfolk, "a general inspection was made of all the damage to the bus, including the steering mechanism." At that time Coach Company removed two bolts from the steering mechanism—two bolts from the booster flange. The record contains no explanation of why Coach Company removed these bolts. On 23 March 1972, at the time the interrogatories were answered, the bolts were in the possession of Coach Company's attorneys. They were in the possession of Coach Company's supervisor of maintenance when Jeffries examined them on 23 September 1968.

Jeffries testified that the function of the two bolts was to unite the booster flange on the power steering cylinder and the flange on the steering arm. The small rings of steel entwined in the threads on these bolts and the wear in the holes in the flanges from which the bolts were removed caused Jeffries to conclude that the steel rings were threads stripped from the nuts which had been on the bolts; that in consequence of the stripping the nuts became loose, worked back and forth, and eventually sheared the cotter pin at the end of the bolt, thereby breaking the connection between the two flanges; and that this severance could or might have caused the steering system to fail when Gibbs attempted to steer the bus around the left curve.

It is apparent that, in phrasing the hypothetical question which elicited the foregoing opinion from Jeffries, counsel was observing the rule stated in 1 Stansbury, *North Carolina Evidence* § 137, at 453 (Brandis rev. 1973), that if the question relates to cause and effect an expert witness "should be asked whether in his opinion a particular event or condition *could* or *might* have produced the result in question, not whether it *did* produce such result." This form of question clearly invited

the argument, which Coach Company makes, that *could* or *might have* in Jeffries' answers amounts to nothing more than his speculation as to possibilities. The situation here produced demonstrates the validity of Professor Henry Brandis' comment that an expert witness should be allowed "to make a positive assertion of causation when that conforms to his true opinion, reserving 'could' and 'might' for occasions when he feels less certainty"; that if the expert witness, "though holding a more positive opinion, is forced to adopt the 'could' or 'might' formula, then the result is patently unjust, unless the more positive opinion may be said to be inherently incredible." 1 Stansbury, *North Carolina Evidence* § 137, at 455 & n. 97 (Brandis rev. 1973). *See also* the comment of Justice Higgins in *Apel v. Coach Co.,* 267 N.C. 25, 30, 147 S.E. 2d 566, 569-70 (1966). *Cf. Service Co. v. Sales Co.,* 259 N.C. 400, 414, 131 S.E. 2d 9, 20 (1963).

[8]   When a jury's inquiry relates to cause and effect in a field where special knowledge is required to answer the question, the purpose of expert testimony is likely to be thwarted or perverted unless the expert witness is allowed to express a positive opinion (if he has one) on the subject. Here, however, Jeffries testified without objection that, in his opinion, the nuts on the bolts connecting the flanges in the steering mechanism were stripped and, in consequence, the bolts became loose and moved back and forth, wearing the holes through which the bolts connected the flanges; that this movement in the flanges finally severed the cotter pin at the end of each bolt, breaking the connection between the power steering cylinder and the steering arm. Jeffries had previously testified that should these flanges become separated there would be no steering power available to the wheel.

[9, 10]   We hold that sufficient evidence was produced at the trial to support a finding that a defective steering mechanism caused the bus to leave the highway. The remaining question is whether Transportation Company offered any evidence tending to show that Coach Company, by a proper inspection, could have discovered the defect prior to delivering the bus to Gibbs on 17 September 1968. The bus was a nine-year-old substitute bus. Its age and the purpose of its use intensified Coach Company's duty to have it inspected carefully by a qualified mechanic before it was delivered to Transportation Company. This duty was imposed by law as well as by its contract with Transportation Company, and its breach would render Coach Company liable not only to Tranportation Company but also to a third

person injured thereby. *Roberts v. Memorial Park*, 281 N.C. 48, 187 S.E. 2d 721 (1972) ; *Wilcox v. Motors Co.*, 269 N.C. 473, 153 S.E. 2d 76 (1967) ; Comment, *Products Liability—Liability of the Bailor for Hire for Personal Injuries Caused by Defective Goods*, 51 N.C.L. Rev. 786 (1973) ; 1 Strong, N. C. Index 2d *Automobiles* § 23 (1967) ; 8 Am. Jur. 2d *Automobiles and Highway Traffic* §§ 663, 704 (1963) ; Annot., 46 A.L.R. 2d 407, 443 (1956).

[11] In response to a series of questions, had Jeffries been permitted to do so, he would have testified in substance as follows: Based upon his personal examination of the entire steering mechanism of the bus, including the bolts from the two separated flanges, in his opinion, the conditions which he found (and upon which he based his conclusion that a defect in the steering mechanism caused the bus to leave the highway) would have been visible to a competent mechanic prior to the time the bus was delivered to Gibbs; that the condition must have existed during two or three thousand miles of operation before it could or might have caused the connection between the flanges to be broken and the steering to fail; that the condition would have been visible to a trained and competent mechanic "by the looseness between the two flanges of the steering cylinder and the steering rod, and the cracking of the dirt, dust and road accumulation in the joint which would signify that the joint was working, that is, moving, when it should be absolutely tight and stationary. The two pieces should not work or move against each other . . . and the nuts and bolt heads would have moved some small amount from their original position, leaving marks of the original position on the flanges."

We hold that the foregoing evidence was competent and its rejection was error entitling Transportation Company to a new trial. Jeffries was an expert mechanic and analyst of damage to mechanical devices. As such his opinion on the matter under investigation could have been helpful to the jury. 1 Stansbury, *North Carolina Evidence* §§ 132-34 (Brandis rev. 1973). To show the nexus between a mechanical defect and an accident "[t]he most convincing evidence is an expert's pinpointing the defect and giving his opinion on the precise cause of the accident after a thorough inspection." *Stewart v. Budget Rent-A-Car Corp.*, 52 Hawaii 71, 76, 470 P. 2d 240, 243 (1970).

[12] Upon the retrial of this case if the jury should find that the bus left the highway *solely* because of the negligent manner

in which Gibbs operated the bus, Coach Company would not be liable to Transportation Company in any amount. *See Anderson v. Robinson*, 275 N.C. 132, 165 S.E. 2d 502 (1969). If the jury should find that the bus left the highway because of a defect in the steering mechanism but that, in the exercise of proper care, Coach Company could not have discovered the defect prior to delivering the bus to Gibbs, Coach Company would have no liability to Transportation Company.

[13] If the jury should find that the bus left the highway because of a pre-existing defect in the steering mechanism which a competent mechanic could and should have discovered by a proper inspection of the bus prior to its delivery to Gibbs, Transportation Company would be entitled to recover indemnity from Coach Company. If this was the situation the two companies were not in equal fault. Coach Company, an independent contractor, had contracted with Transportation Company to furnish it buses for the transportation of passengers and to maintain the buses. However, Transportation Company, a common carrier, could not delegate to Coach Company its duty to use the highest degree of care to provide safe buses for its passengers. Under these circumstances, therefore, if Transportation Company was operating a bus with a pre-existing defect in the steering mechanism which Coach Company should have discovered, the negligence of Coach Company was primary and that of Transportation Company was secondary. *See Hendricks v. Fay, Inc.*, 273 N.C. 59, 159 S.E. 2d 362 (1968) ; *Edwards v. Hamill*, 262 N.C. 528, 138 S.E. 2d 151 (1964) ; *Steele v. Hauling Co.*, 260 N.C. 486, 133 S.E. 2d 197 (1963) ; *Newsom v. Surratt*, 237 N.C. 297, 74 S.E. 2d 732 (1953) ; *Motor Lines v. Johnson*, 231 N.C. 367, 57 S.E. 2d 888 (1950) ; Prosser, *Law of Torts* 310-13 (4th ed. 1971). Coach Company concedes that if there was a defect in the bus, Transportation Company had no knowledge of it.

The fact that defendant Coach Company, which plaintiffs alleged to be a joint tort-feasor with defendant Transportation Company, was dismissed from plaintiffs' suits at the close of plaintiffs' evidence was merely an adjudication that plaintiffs had not offered any evidence tending to establish actionable negligence on the part of Coach Company. The dismissal did not adjudicate that, as between Transportation Company and Coach Company, the two companies were not liable to plaintiffs as joint tort-feasors.

[14]   If, from evidence adduced at the retrial, the jury should find Coach Company was guilty of actionable negligence in furnishing Transportation Company a defective bus; that Gibbs was negligent in the manner in which he operated the bus; and that the negligence of both concurred in proximately causing the accident in which plaintiffs were injured, Transportation Company would be entitled to contribution from Coach Company. *See* G.S. 1B-1, G.S. 1B-3 (1969); *Pearsall v. Power Co.,* 258 N.C. 639, 129 S.E. 2d 217 (1963).

We are constrained to say that upon the next trial more carefully phrased hypothetical questions and more precise answers will greatly facilitate an understanding of the mechanical problems presented by the evidence.

The decision of the Court of Appeals is reversed with directions that the cause be remanded to the Superior Court of Dare County for a retrial in accordance with the rules of law stated in this opinion.

New trial.