***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Garner. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award; therefore, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties were subject to the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between the named employee and the named employer.
3. The named employer is self-insured.
4. The employee's average weekly wage is $268.75, which yields a compensation rate of $179.16 per week.
5. The employee started missing work because of a condition on or about February 2, 1999.
6. The parties contested whether or not the condition arose out of and in the course of employment and whether this claim is compensable. The issues to be heard by the Full Commission are:
 Whether plaintiff sustained an occupational disease while in the course and scope of her employment on or about February 2, 1999, as defined by G.S. §§ 97-2(2) and 97-53(13);
 Whether plaintiff is entitled to TTD for the period of February 2, 1999, to the present and continuing;
 Whether defendant is entitled to attorney's fees because plaintiff unreasonably prosecuted her case; and
 Whether defendant reasonably defended the claim based on the evidence presented.
Stipulated documents were Industrial Commission Forms, plaintiff's answers to pre-hearing interrogatories and medical records submitted on May 25, 2001, at the hearing before the deputy commissioner.
The deposition of Dr. Eddie N. Powell is a part of the evidentiary record in this case.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
 FINDINGS OF FACTS
1. Plaintiff worked for defendant-employer off and on for approximately six years as a permanent seasonal production associate. Plaintiff worked each season from March to October or November and then did not work again until the next season. Plaintiff alleged developing carpal tunnel syndrome on November 2, 1999.
2. On February 2, 1999, Dr. Eddie Powell completed a Medical Certification (Family and Medical Leave Act of 1993) indicating that the plaintiff was unable to return to employment in any capacity from February 2, 1999, through March 2, 1999. The diagnosis was listed as severe shoulder bursitis and ruled out bilateral carpal tunnel syndrome versus radiculopathy. On the second page of the FMLA form, Dr. Powell marked that plaintiff was being taken out of work on February 2, 1999, for reasons unrelated to an injury or sickness arising out of plaintiff's employment.
3. Dr. Powell completed a second Medical Certification on March 4, 1999. Dr. Powell indicated that plaintiff was unable to return to employment in any capacity from March 3, 1999, through April 4, 1999. Dr. Powell diagnosed plaintiff with peripheral neuropathy versus radiculopathy. Dr. Powell also wrote plaintiff out of work from April 5, 1999, through May 5, 1999, for peripheral neuropathy and from May 5, 1999, through May 12, 1999, for cervical radiculopathy.
4. On March 5, 1999, plaintiff filed for short-term disability and listed her condition as bursitis. Plaintiff received short-term disability benefits from February 2, 1999, through August 16, 1999, at which time the maximum benefit had been paid out. At that time, plaintiff filed a workers' compensation claim listing the date of injury as November 2, 1999.
5. On June 12, 1999, Dr. Powell completed another Medical Certification authorizing plaintiff out of work from June 12, 1999, through August 14, 1999, for peripheral neuropathy and arm neuropathy with left carpal tunnel syndrome. Plaintiff was again authorized out of work from August 27, 1999, through September 22, 1999, for cervical radiculopathy with peripheral neuropathy and arm neuropathy with left carpal tunnel syndrome.
6. On September 21, 1999, plaintiff returned to Dr. Powell for a follow up of her arm symptoms. Dr. Powell's diagnosis changed to peripheral neuropathy with second trimester pregnancy with carpal tunnel syndrome. As a result of this condition, plaintiff was authorized out of work from September 21, 1999, through November 2, 1999. This condition remained unchanged and, accordingly, the plaintiff was authorized out of work from November 21, 1999, through May 29, 2000.
7. On October 23, 2000, Dr. Powell found plaintiff to be at maximum medical improvement, released plaintiff from his care and stated that her symptoms had resolved. Dr. Powell did not provide plaintiff with a permanent partial impairment rating.
8. Plaintiff worked as a seamer for defendant-employer as a seasonal employee for approximately six years. Plaintiff said that she would put a sleeve of lids onto a machine.
9. Plaintiff testified that her position with defendant-employer was running a seamer for a total of approximately seven hours a day. According to plaintiff, running the seamer included placing sleeves of lids into a machine that would put lids onto a can.
10. Plaintiff also testified that the different lines that she worked varied in speed, such as the beans lines, which she said were slower than others. Plaintiff admitted that when running a line with beans, "you didn't have to reach in the box that much" to get out the lids. Plaintiff's job also included inspecting goods on a product line that did not deal with repetitive motion. When plaintiff went out of work in November of 1999, she was working solely on the inspection line. Before she left, plaintiff explained to her supervisor, Robert Caldwell, that she was feeling pain in her chest.
11. Mr. Robert Caldwell is a production manager for defendant-employer. In describing the nature of plaintiff's position, Mr. Caldwell testified that the weight of the objects plaintiff would pick up were somewhere from 2.5 to 2.8 pounds. Mr. Caldwell stated at most there was potentially "a little repetition" in plaintiff's job duties if you were to try and take a few of the ends at a time and load the magazine on the 300 line. Plaintiff did not perform this type of loading. Plaintiff would place the stack or sleeve of lids in the machine.
12. There would be about a minute and a half interval before having to re-stack the lids. The employees running the machines were monitoring the product line when not filling up the sleeves. The sleeves plaintiff handled were only approximately 2.5 to 2.8 pounds. The employees would rotate the jobs including working at an inspection position that did not require repetitive use of the hands. The plant made a special attempt to place an employee on the inspection line if they had any medical problems.
13. When plaintiff left on short-term disability leave, she was working on the inspection line because she had previously informed Mr. Caldwell that her chest was bothering her.
14. Dr. Powell indicated that plaintiff's description of her job duties told him little about her position and claimed that she was a "very poor historian." Dr. Powell agreed that working eight hours a day grabbing sleeves and slamming them down into a machine would cause someone to be at a greater risk of contracting CTS. However, there was no testimony from plaintiff or Mr. Caldwell that plaintiff slammed down any lids. Dr. Powell also asserted that CTS was rarely found in canning and was more readily found in work that required a ten to twelve hour day.
15. Dr. Powell stated that he found carpal tunnel mainly in the following situations:
 ". . . heavy-duty use of the hands, as you might say. Cans will be — I will say medium use. I'm talking about a gentleman that has to pull, you know, a six to seven, eight pound, you know, guts out of a hog, or they're sitting up and they have to cut the ham, and that ham weighs four or five, you know, ten pounds. I note that there's an increasing likelihood with that, but not too many canners."
16. Dr. Powell said that he had never visited the plant nor had seen a videotape of plaintiff's job duties.
17. Plaintiff had notable weight problems and a pregnancy that potentially could have caused her CTS. Dr. Powell testified that being overweight could be an increased factor in contracting CTS. Plaintiff's medical records show that she was well in excess of 200 pounds at times.
18. Plaintiff's pregnancy also raises questions as to how she contracted the disease. Dr. Powell would not commit to the theory that pregnancy could be linked to CTS. However, his testimony shows there is a difference in the field of research. Dr. Powell stated that he would have to adhere to the current standard answer until further research had been completed.
19. Dr. Powell's diagnosis of plaintiff's CTS coincides very well with her pregnancy and the date of her recovery with the end of her pregnancy. Dr. Powell did not diagnose plaintiff with CTS until June 12, 1999, which corresponds favorably to when plaintiff became pregnant. Moreover, plaintiff's problems resolved approximately seven weeks after her pregnancy ended.
20. Dr. Powell opined that there was a 5% to 10% chance that CTS cases are idiopathic.
21. After being asked about plaintiff providing him with her job duty functions, Dr. Powell testified that plaintiff never provided them to him and that he could only answer the question "truthfully."
22. Dr. Powell stated that he could not render a medical opinion as to a medical degree of certainty, because he did not have enough information "to base any kind of decision." Dr. Powell reluctantly stated at one point in his testimony that plaintiff's condition "could have" been a result of her job. However, he later clarified that he did not really know the answer to that question. Dr. Powell maintained that his main problem with the issue of causation was that plaintiff did not provide him with the information he required to give an accurate opinion. Dr. Powell stated that he asked plaintiff "on five different visits" to describe the use of her hands at work, but she never told him.
23. In answering the question of whether plaintiff could have developed her condition from her employment, Dr. Powell established that:
 "I — I don't like to look back in retrospect and try to change an answer that I didn't have that history when it was — when it was presented to me. That's unfair to the defendant. That's unfair to the patient. And furthermore, it's unfair to the education that's been bestowed upon me by God and man about medicine. If that patient cannot give me a reliable history, that's the patient's fault. It's not the company's fault. It's not the doctor's fault."
24. Plaintiff has failed to prove by the greater weight of the evidence that her condition was linked to her employment. Instead, medical testimony and testimony at the hearing clearly show that plaintiff was never taken out of work for a condition related to her employment. Dr. Powell took plaintiff out of work for a condition that was not work related based upon the FMLA form and never indicated in his medical records that the condition was related. Moreover, Dr. Powell could not relate plaintiff's condition to her job. The facts of the case show that plaintiff was working a different job at the time she left work. The plaintiff was taken out of work for an unrelated condition. She became pregnant while out of work, and she was diagnosed with CTS at the same time. She had her child, recovered from CTS after the child's birth and is currently able to work.
25. There is no evidence that defendant defended this action in bad faith or without reasonable grounds. There are, therefore, also no grounds for awarding plaintiff attorney's fees in this case.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. North Carolina General Statute § 97-53 governs occupational disease under the North Carolina Workers' Compensation Act. The catch-all provision provides as follows:
 (13) Any disease . . . which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary disease of life to which the general public is equally exposed outside of the employment.
2. Whether the disease is enumerated by the Act determines the elements that the plaintiff will have to prove in order to succeed in his or her claim. If the disease is not enumerated, the plaintiff must proceed under N.C. Gen. Stat. § 97-53(13). In such cases, the following elements must be proven:
 (1) The disease must be characteristic of a trade or occupation (there must be an increased risk to the individual on account of this employment), and
 (2) The disease must not be an ordinary disease of life to which the public is equally exposed outside of the employment; and
 (3) There must be proof of causal connection between the disease and the employment.
These requirements were discussed in the North Carolina Supreme Court case of Booker v. Duke University Medical Center, 297 N.C. 458,256 S.E.2d 189 (1979). In Booker, the Court stated as follows:
 A disease is "characteristic" of a profession when there is a recognizable link between the nature of the job and an increased risk of contracting the disease in question . . . "peculiar to the occupation" means that the conditions of the employment must result in a hazard which distinguished it in character from the general run of occupations . . . and is in excess of that attending employment in general.
Id. Accordingly, plaintiff has not shown enough evidence through testimony or medical evidence to overcome her burden of proving a link between her job duties and her condition.
3. In order to support workers' compensation benefits, there must be medical evidence to "a reasonable scientific probability that the stated cause produced the stated result. Evidence is insufficient on causation if it `raises a mere conjecture, surmise, and speculation." Phillips v.US Air, Inc., 120 N.C. App. 538, 542, 463 S.E.2d 259, 262 (1995). When positing a link between the injury and the action, a "probability" is not enough in medical testimony to prove causation. Peeler v. PiedmontElastic, Inc., 132 N.C. App. 713, 514 S.E.2d 108 (1999). In addition, inYoung v. Hickory Bus. Furniture, 353 N.C. 227, 538 S.E.2d 912 (2000) the Supreme Court addressed the use of "could have" when stating an opinion about the cause of fibromyalgia. The Court noted that while it has previously found "could" or "might" expert testimony to be competent evidence to prove causation, see id. at ___, 538 S.E.2d at 916 (citingMann v. Virginia Dare Transp. Co., 283 N.C. 734, 747-48, 198 S.E.2d 558,567-68 (1973)), it also found "could" and "might" expert testimony to be insufficient to support a causal connection when there is additional evidence or testimony to show the expert's opinion to be a guess or mere speculation, see Id. (citing Maharias v. Weather Bros. Moving Storage Co., 257 N.C. 767, 767-68, 127 S.E.2d 548, 549 (1962)). Dr. Powell clearly stated in this case that he did not have the information to determine whether plaintiff's condition was related to her employment. He took plaintiff out of work on February 2, 1999, for reasons unrelated to an injury or sickness arising out of plaintiff's employment. Dr. Powell's testimony was consistent with this opinion. Thus, plaintiff has not proven by the greater weight of the evidence that her job duties caused her condition.
North Carolina General Statute § 97-88.1 states as follows:
 If the Industrial Commission shall determine that any hearing has been brought, prosecuted, or defended without reasonable ground, it may assess the whole cost of the proceedings including reasonable fees for defendant's attorney or plaintiff's attorney upon the party who has brought or defended them.
The purpose of this section is to "prevent `stubborn, unfounded litigiousness' which is inharmonious with the primary purpose of the Workers' Compensation Act to provide compensation to injured employees." The facts of this case show that plaintiff did not have sufficient evidence to prove an occupational disease. Consequently, there is no evidence that defendant defended this action in bad faith or without reasonable grounds. Therefore, there are no grounds for awarding attorney's fees to either side.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 ORDER
Plaintiff's claim for benefits is hereby DENIED.
Each side shall bear its own costs.
This the ___ day of January 2002.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
DISSENTING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER